**TRAMP OIL AND MARINE LTD., Plaintiff,**

v.

**M/V MERMAID I, her engines, tackle, equipment and appurtenances, in rem, Defendant.**

**Civ. No. 82–0858 (RLA).**

United States District Court, D. Puerto Rico.

Feb. 6, 1986.

Herbert W. Brown, III, San Juan, P.R., for plaintiff.

J. Ramón Rivera Morales, Jiménez, Graffam & Lausell, San Juan, P.R., for defendant.

## OPINION AND ORDER

ACOSTA, District Judge.

### PROCEDURAL BACKGROUND

This is an *in rem* action filed by Tramp Oil and Marine, Ltd., (Tramp Oil) against the M/V Mermaid I (Mermaid), claiming to hold a maritime lien against the vessel under 46 U.S.C. §§ 971, *et seq.*[1] The vessel was attached under the supplementary admiralty rules of the Federal Rules of Civil Procedure and subsequently released when the owner filed a letter of undertaking from the underwriter.

Upon Mermaid's motion of January 10, 1984, the Court dismissed the *in rem* action pursuant to the doctrine of *forum non conveniens,* said decision was reversed on appeal in *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 743 F.2d 48 (1st Cir.1984).

At this time, we are called upon to decide whether or not plaintiff holds a maritime lien which it may enforce through these *in rem* proceedings.

### THE FACTS

The facts relevant to this action seem complicated due to the number of entities involved in the transactions that led to this suit.

As ably summarized by the Court of Appeals,[2] Prince Arrow, S.A. of Panama, owner of the Mermaid, time-chartered the vessel to Tokyo Boeki, Ltd. of Japan, which in turn subtime-chartered it to Logos Shipping APS (Logos), of Copenhagen, Denmark. While in the Port of Savannah, Georgia, the vessel, through its master, requested Logos for bunker fuel. Logos asked J & L Bunkers A/S (J & L), of Copenhagen, Denmark, to arrange for the supply and delivery, which it did by contracting Tramp Oil, of England, a broker of bunker fuel. Tramp Oil contacted Exxon International (Exxon) who caused Colonial Oil Industries, Inc. (Colonial) to deliver the oil to the Mermaid in Savannah.

Tramp Oil paid Exxon, who then proceeded to satisfy Colonial's debt. Thereafter, Tramp Oil requested payment from J & L,

---

1. Plaintiff also asserted *in personam* claims against the vessel owner and charterer. It appearing these defendants could not be served with process, the action filed against them is hereby dismissed.

2. *Tramp Oil and Marine, Ltd., supra,* 743 F.2d at 49–50.

its parent company, the owner, and the master of the vessel. J & L sought and obtained full payment from Logos, but only advanced partial payment to Tramp Oil, who has not been able to collect an unpaid balance of Forty-Six Thousand Three Hundred Sixty Dollars and Sixteen Cents ($46,360.16) from either J & L or its parent company because they went into bankruptcy.[3]

## MOTIONS PENDING

The parties have filed cross-motions for summary judgment. Defendant, on January 16, 1985 (Docket no. 45), claimed that plaintiff did not hold an enforceable maritime lien, whereas plaintiff on February 12, 1985 (Docket No. 47) renewed a previous motion for summary judgment alleging it was entitled to a maritime lien.

## ARGUMENT

The Federal Maritime Act, 46 U.S.C. §§ 971 through 975, confers a maritime lien to "/a/ny person furnishing ... supplies ... or other necessaries to any vessel ... upon the order of the owner of such vessel, or of a person authorized by the owner ..." 46 U.S.C. § 971.

## MARITIME LIENS

The origins of the personality of a ship, independent from its owner, stem from its intrinsic mobility. Commercial transactions in distant shores and the need for the vessels to continue in operation gave rise to maritime liens, which may be enforced directly against the vessel through *in rem* proceedings. *2 Benedict on Admiralty*, sec. 21; G. Gilmore and C. Black, *The Law of Admiralty*, (2d ed. 1975), Ch. IX, pp. 586, *et seq.*

3. The following chart represents the position of the parties involved in the fuel transactions *vis-à-vis* each other:

A maritime lien, once accrued, attaches to a vessel and will follow the ship until it is satisfied or payment is obtained through a sale in an *in rem* proceeding. "In the *in rem* proceeding the owner bears no personal liability. The vessel is sold solely to satisfy the lien." *Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1165 (5th Cir.1984).

The Federal Maritime Lien Act, in providing for a lien for "supplies" or "other necessaries", seeks to keep the ship operating, allowing for the flow of commerce while protecting the interests of the owners and secured parties.[4]

In order to ascertain which items fall within "other necessaries" within the meaning of the statute, "/t/he appropriate test ... is whether the goods or services in question were necessary to the continued operation of the vessel." *Payne v. SS Tropic Breeze*, 423 F.2d 236, 241 (1st Cir.), *cert. denied, Samadjopoulos v. National Western Life Ins. Co.*, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970), cited with approval in *Farrell Ocean Services, Inc. v. United States*, 681 F.2d 91, 92–93 (1st Cir. 1982).

Fuel supplied to a vessel for its own use to enable it to proceed with its voyage is a clear example of what "necessaries" are giving rise to a maritime lien. *See, Belcher Co. of Alabama, Inc., supra,* 724 F.2d at 1163.

Under 46 U.S.C. § 972, the ship master is presumed to have authority from the owner to "procure ... necessaries for the vessel ..." Through an amendment in 1971, this principle was extended to a master appointed by a charterer. 46 U.S.C. § 973. Accordingly, "maritime liens /may/ be en-

```
Logos
 /
 J&L
 /
Tramp Oil
 /
 Exxon
 /
Colonial
```

4. On appeal, the Court found that since the Mermaid, although a foreign ship, had been

forced even if it was the charterer rather than the owner who had ordered the supplies giving rise to it." *Gulf Trading & Transp. Co. v. M/V Tento*, 694 F.2d 1191, 1194 (9th Cir.1982), *cert. denied, I/S Norexim v. Gulf Trading & Transp. Co.*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983).

■ There does not seem to be controversy over the fact that the bunker fuel was furnished to the Mermaid for its own use and that the fuel was supplied upon instructions of the master, who had authority for the request. Accordingly, the supply of bunker fuel gave rise to a maritime lien as "necessaries" within the meaning of section 971. Furthermore, Exxon and Colonial, as direct suppliers, would be the ones entitled to the protection of the maritime lien provisions of section 971.[5]

## SUBROGATION

Plaintiff's claim to a lien through these *in rem* proceedings is based on its purported right to automatically stand in the shoes of the American suppliers by mere payment for the fuel.

■ Subrogation takes place when a party substitutes another with respect to a particular claim. Subrogation may result from an agreement between the parties, better known as "conventional", or from the application of equitable principles, referred to as "legal". 73 Am.Jur. 2nd, *Subrogation*, sec. 2–3 (1974).

■ The doctrine of subrogation applies when a person, "not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." *Id.*, sec. 6 at 602 (footnote omitted). It aims at doing justice and is ruled by principles of equity, good conscience and public policy. Subrogation will not be available if it would work

injustice, affect innocent parties or would run contrary to public policy. *Id.*, sec. 12.

Accordingly, the circumstances present in each case will determine whether or not the interests at stake require the benefits of subrogation be conferred to a particular party.

A party will normally stand in the shoes of a creditor upon payment of an outstanding debt; the question remains, however, whether a maritime lien securing a particular debt will be transferred to the new creditor. In other words, whether the subrogation to the rights of a party carries with it the right to the lien providing security therefor.

In the United States, two types of subrogation to maritime liens have been generally recognized: advances to the vessel owner or his agent for satisfaction of a third party's lien on the vessel or assignment of a maritime lien pursuant to an agreement. *See*, Tetley, "Assignment and Transfer of Maritime Liens: Is There Subrogation of the Privilege?", 15 J.Mar.L. & Com. 3 (1984) at p. 393.

> Any person advancing money to a ship on the order of the master or one entrusted with her management and for the purpose of satisfying outstanding or future lien claims against the vessel is entitled to a lien of equal dignity with the one replaced, provided the amounts so advanced are actually applied to the payment of such debts.

*2 Benedict on Admiralty*, sec. 33, pp. 3–12 thru 3–13 (footnotes omitted). *See also*, G. Gilmore and C. Black, *The Law of Admiralty*, sec. 9–21.

In *Medina v. Marvirazon Compañia Naviera, S.A.*, 709 F.2d 124, 125 (1st Cir. 1983), the Court found that funds used to discharge seamen's wage liens allowed for subrogation to the lienors' rights provided the one making payment did not occupy "such a close relationship to the vessel and its owners and exercised sufficient control

---

provided with fuel by United States suppliers in a United States port, "the suppliers, at least, clearly had rights under the lien provisions of

the Ship Mortgage Act". *Tramp Oil and Marine, Ltd., supra,* 743 F.2d at 51 n. 3.

**5.** *Id.*

over the ship that it would be inequitable to grant him a lien". Advances made to the ship for purchasing supplies and other necessaries within the meaning of 46 U.S.C. § 971 give rise to a maritime lien. *Universal Shipping v. Panamanian Flag Barge*, 563 F.2d 483 (1st Cir.1976).

Advances to a ship or on its behalf to pay for seamen's wages and suppliers of "necessaries" provided to a ship entitled the one making the advances to become subrogated to the claims of those creditors provided its relationship with the owner did not qualify as a joint venture. *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204 (5th Cir. 1978).

Maritime liens may also be assigned allowing for the assignee to stand in the shoes of the assignor provided the assignee has no close relationship to the owner. Furthermore, in cases of assignment of wages, the courts will ensure that adequate consideration has been paid and no undue advantage has been taken. *2 Benedict on Admiralty*, sec. 26; G. Gilmore and C. Black, *The Law of Admiralty*, sec. 9–21.

 An assignment takes place when a third party pays off the creditor directly and is subrogated in the creditor's rights in the debt and the lien. Assignments should be in writing and notice thereof is to be given to the debtor. However, "/t/he formalities of assignment in the United States Maritime Law have not been rigidly defined ..." Tetley, *supra* at p. 413.

 There is no evidence in our records indicating that the payment made by Tramp Oil to Exxon was done under instructions of the master or someone entrusted with authority as an advance to discharge the liens for supply of fuel. Therefore, no subrogation to a possible maritime lien could have taken place as an advancement.

There is no indication the lien for necessaries was effectively assigned to Tramp Oil, allowing plaintiff to become subrogated to the rights of the suppliers.

Apart from advances and assignments, legal subrogation to a claim against the vessel was also allowed in *Matter of Ta Chi Navigation (Panama) Corp., S.A.*, 513 F.Supp. 148 (E.D.La.1981). The Court found that the United States, having paid the claims of cargo owners arising from the unseaworthiness of a third-party's vessel for fear it might be found liable, was entitled to assert the claims of the cargo owners against the negligent ship. The Court reasoned the United States was not acting as a mere volunteer when it satisfied the debt of another since it was seeking to protect itself from any eventual liability and, hence, was entitled to be reimbursed for those monies.

Equity subrogation principles have also been utilized in cases involving payment of freight charges owed where shippers utilize intermediaries for the cargo to reach a particular carrier.

In *Compañia Anónima Venezolana de Nav. v. A.J. Pérez Exp. Co.*, 303 F.2d 692 (5th Cir.1962), the shipper paid the freight forwarder in advance. The freight forwarder, however, did not remit payment to the local agent for the carrier. The agent, pursuant to its duty under a guarantee paid the charges to the carrier without making a reservation of rights. The Court held that, regardless of any action the carrier could have brought against the shipper, the agent was not entitled to stand in the shoes of the carrier. Based on equitable principles, it should be the agent the one to bear the loss since, the loss was due to his own lack of diligence and by having extended credit to the freight forwarder.

In *Naviera Mercante, S.A. v. Northrup King Co.*, 491 F.Supp. 508 (S.D.Tex.1980), a similar situation existed. The Court went even further to hold that the shipper was not liable to the carrier for freight charges already paid by the shipper to the freight forwarder because the loss was due to the shipper's agent in extending credit to the freight forwarder. The Court reasoned the shipper should not be held to pay twice when it had no control over the transactions and credit terms between the forwarder and the carrier.

In *Inversiones Navieras Imparca v. Polystar Intern.*, 465 F.Supp. 102 (S.D.Fla. 1979), once again the shipper was found not to be liable to a carrier when the freight forwarder failed to remit the carrier payment of freight funds from the shipper when the carrier had issued its bill of lading "Ocean Freight Prepaid".

The situation in the case before us boils down to a simple question: Who should bear the loss caused by the bankruptcy of J & L? Should it be the charterer for having selected J & L as a broker, or should it be Tramp Oil for having chosen to run a risk by having extended J & L credit?

Public policy is not affected in this case by failing to allow subrogation of a lien to Tramp Oil. The Maritime Lien Act seeks "to protect terminal operators, ship chandlers, ship repairers, stevedores and other suppliers who in good faith furnish necessaries to a vessel." H.Rep. No. 92–340, 92nd Cong., 1st Sess., reprinted in 1971 U.S.Code Cong. and Ad.News 1363. The lien imposed by the statute is akin to the one traditionally associated with "the law of the land where a plumber, carpenter or other artisan has a lien on property for services furnished but not paid for." *Id.*

As a broker, Tramp Oil is in the business of causing suppliers to furnish fuel, but it did not directly supply it in this case. However, it was in a position to protect its own interest by either denying J & L credit or requesting Exxon or Colonial to assign their lien.[6] Equity does not mandate that Tramp Oil automatically become subrogated to the lien of the suppliers. It must bear the loss since it chose to run the risk.

■ The charterer, on behalf of the vessel, paid for the "necessaries" supplied. We see no equitable principle demanding that it pay again. Tramp Oil is not entitled to become subrogated to the lien under either legal or conventional subrogation principles.

**6.** Depending on the circumstances, a broker may also "advance" monies to the owner and

SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure allows for summary judgments to be entered when no issues of material fact remain in litigation and the moving party is entitled to the relief requested as a matter of law.

Movant bears the burden of convincing the Court no relevant facts are still in dispute while the party opposing the request must set forth all factual controversies that preclude judgment in a summary fashion. *General Office Products Corp. v. A.M. Capen's Sons, Inc.*, 780 F.2d 1077 (1st Cir.1986).

Accordingly, the motion for summary judgment submitted by the Mermaid on January 16, 1985 (Docket No. 45) is hereby granted and the *in rem* action filed against it is hereby dismissed.

Plaintiff's motion for summary judgment reinstated on February 12, 1985 (Docket No. 47) is hereby denied.

IT IS SO ORDERED.

become entitled to the lien.