**A/S DAMPSKIBSSELSKABET TORM, et al., Plaintiffs,**

**Reederi Johnny Wesch K.G., et al., Plaintiffs-Appellees,**

v.

**McDERMOTT, INC., et al., Defendants-Appellants.**

No. 84–3812.

United States Court of Appeals, Fifth Circuit.

May 5, 1986.

---

Arden J. Lea, Lea & Gibbens, David J. L'Hoste, New Orleans, La., for defendants-appellants.

Benjamin W. Yancey, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for plaintiffs-appellees.

Before: BROWN, REAVLEY, and HILL, Circuit Judges.

## OPINION

JOHN R. BROWN, Circuit Judge:

The defendants appeal from a finding that they were 85% at fault for damages sustained to the plaintiffs' vessel during unloading operations in West Africa, and from a judgment that they take nothing on their counterclaim alleging delay incurred by the inadequate unloading boom outreach of another of the plaintiffs' vessels. We affirm.

### The Oil Bidness Goes to the Dark Continent

The claims in the case arise out of separate incidents involving the vessels M/V MAGDALENA WESCH and M/V HIGH SEAS PROMISE. Both vessels were time chartered by Torm Singapore (Pic.) Ltd. whose active manager was A/S Dampsk-ibsselskabet Torm, wisely referred to by the parties in this case as Torm Denmark and sometimes even more simply as Torm.

Torm Denmark, operating under the name Torm West African Lines, carried cargo from New Orleans and other United States ports to West Africa. On the particular voyages at issue in this litigation, Torm Denmark was transporting various oilfield machinery and pipe from New Orleans to Soyo, Angola for McDermott, Inc. and a group of McDermott divisions and subsidiaries (collectively McDermott). Soyo is an open roadstead at the mouth of the Congo River and has no facilities, such as a harbor or wharves, usually associated with a port. Consequently, the bills of lading covering the MAGDALENA WESCH and the HIGH SEAS PROMISE shipments specified that the cargo would be unloaded offshore into McDermott barges.

The initial claim in this case was asserted by Torm Denmark against McDermott. Torm Denmark claimed that, in the process of unloading the MAGDALENA WESCH, various McDermott barges collided with and damaged her. McDermott later pressed a counterclaim associated with the earlier unloading of the HIGH SEAS PROMISE at Soyo. McDermott's counterclaim alleged that the ship's boom used to unload the cargo of the HIGH SEAS PROMISE was insufficient for the job and the resulting problems caused McDermott to incur unexpected costs and delay.

Both claims were tried together in the United States District Court for the Eastern District of Louisiana. After the evidence was presented, Judge Feldman held

that McDermott was 85% responsible for the damage caused to the MAGDALENA WESCH because McDermott did not properly fender the barges that it brought alongside her. Judge Feldman also found no evidence of an agreement between McDermott and Torm Denmark regarding the outreach of the HIGH SEAS PROMISE's boom, and that consequently, McDermott could not recover on its counterclaim. McDermott appeals.

### Faulty Fenders

■ McDermott first disputes the trial court's determination that McDermott was 85% at fault for the damages incurred by the MAGDALENA WESCH. McDermott claims that, as a result of a previous incident involving the MAGDALENA WESCH and McDermott barges, Torm Denmark expected to incur some damage to the MAGDALENA WESCH and agreed with McDermott that Torm Denmark would provide adequate fendering for her. McDermott also claims that it was the inadequate anchoring of the MAGDALENA WESCH, not the movement of the McDermott barges, which led to the damages that were sustained.

To succeed on appeal, McDermott must convince this Court that the District Court's findings of fact are clearly erroneous. F.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The fact that the appellate court might reach a different conclusion based on the facts does not necessarily result in a "definite and firm conviction." *Allaire v. Rogers,* 658 F.2d 1055, 1059 (5th Cir.1981).

The District Court heard a large volume of evidence about which vessel was unsteady and caused the collisions, which vessel should have provided an adequate fendering system, and the conditions under which a McDermott employee signed an acceptance of liability. Much of the testimony was conflicting.

Torm Denmark's witnesses maintained that the MAGDALENA WESCH was damaged because the fendering system of McDermott's barge, the DB-15, consisting only of built-in wooden fenders, was inadequate. Torm Denmark further maintained that McDermott allowed the DB-15 to collide with the MAGDALENA WESCH.

McDermott presented witnesses who testified that, before the voyage, they had spoken with Johnny Sabild, the superintendent of cargo of the MAGDALENA WESCH, and that he assured them that Torm Denmark would provide Yokohama fenders (large floats placed in the water between vessels) for the unloading. McDermott also relied on a telegram from Torm Denmark to Sabild, instructing him to purchase four or five large scraper (a large off-road machine) tires to prevent "expected" damage. The cargo supervisor testified that he was unable to locate scraper tires and instead, purchased twenty or more smaller truck tires.

Sabild testified that he had not promised to provide Yokohama fenders and that if he had promised to provide anything, it would be only to provide "adequate" fendering. Torm Denmark also introduced evidence that Yokohama fenders would not have been appropriate for this type of vessel or voyage. McDermott argues that the cargo supervisor cannot be believed because his recollection was vague and because he changed his testimony from "I did not promise anything" to "I might have promised to provide adequate fendering." McDermott also argued at trial that the collisions had to be caused by the MAGDALENA WESCH because it was anchored with only two bow anchors while the DB-15 was anchored with a series of five to eight anchors that allowed it to make very precise movements.

Torm Denmark's witnesses testified that during later unloading operations, two other McDermott barges struck the MAGDALENA WESCH, causing additional damage, because the barges had no fenders

and because a tug holding one of the barges lost power and allowed the vessels to collide. McDermott asserted that the damage occurred because Torm Denmark failed to provide the promised fendering and because the truck tires that were used were inadequate. McDermott further asserted that the tug that lost power was being used to hold the MAGDALENA WESCH because her bow anchors were inadequate to hold her securely in the seven knot current of the Congo River.

Further dispute centered on a written acceptance of liability signed near the end of the unloading operations by Tom Arnold, a McDermott employee. McDermott maintained that the document was signed "under duress" because the captain of the MAGDALENA WESCH told Arnold that he would not allow the barges to remain alongside unless the document was signed. Torm Denmark pointed out that Arnold added no qualifications to the document when he signed it.

Our review of the record does not leave us with a firm conviction that a mistake has been committed. Judge Feldman played an active role at trial, often questioning witnesses at length. In his District Court opinion, he carefully described the conflicting testimony only briefly summarized above and indicated which witnesses he found to be credible and why. He made detailed findings of fact supported by the evidence he found most convincing.

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985).

We therefore affirm the District Court's finding that McDermott was 85% at fault for the damage caused to the MAGDALENA WESCH.

### Baby Booms

The second issue tried was McDermott's counterclaim alleging damages from the delay in unloading another Torm Singapore-chartered ship, the HIGH SEAS PROMISE. McDermott claimed that two separate deficiencies in the HIGH SEAS PROMISE led to the delay. First, the HIGH SEAS PROMISE's boom was unable to unload heavy pipe joints to the center of McDermott's barges and McDermott was forced to provide its own derrick barge to complete the unloading. Second, the HIGH SEAS PROMISE was not equipped with a forklift to unload pallets of mastic containers and consequently, the pallets had to be broken down and each of more than 11,000 containers unloaded separately by hand.[1]

The HIGH SEAS PROMISE was transporting, among other things, joints of 30-inch cement-coated pipe, each of which weighed about 20,000 pounds. The pipe was to be unloaded into McDermott barges which were 72 feet wide. An efficient method of stowing pipe aboard a barge is to place the pipe parallel to the barge centerline in layers, with each joint placed in the "nest" or recess formed by two adjacent pipes in the layer below. For heavy pipe that cannot easily be manually repositioned once aboard the receiving barge, this stowing configuration can only be achieved if the boom unloading the pipe reaches at least to the barge centerline. By shifting the barge, the pipe can then be placed over the entire deck area and stacked as high as conditions permit.

---

**1.** Most of the testimony at trial and the argument on appeal centered on the boom issue. The District Court did not specifically refer in its opinion to McDermott's claim about delay incurred in the unloading of the mastic, but the trial judge did find that any delay in unloading the HIGH SEAS PROMISE was not unreasonable. We do not consider that finding to be clearly erroneous, and we devote the remainder of this discussion to the boom issue.

McDermott claimed that although Torm Denmark had to understand that a 36-foot boom outreach was required to offload the pipe into McDermott's barges, the HIGH SEAS PROMISE's boom was able to lift a single pipe joint only about 20 feet from the side of the ship. This brought the pipe joints only to the edge of the McDermott barges. From there, the pipe joints had to be rolled into position over dunnage placed in the recesses of the pipe layer below. Often the pipe did not roll evenly into the proper position and came to rest across several of the pipes below, resulting in incomplete layers of pipe. Furthermore, because each successive layer of pipe was one joint narrower than the layer below, once three layers of pipe were aboard the barge, the boom's outreach was no longer sufficient to place the pipe atop the uppermost layer. This resulted in the barge's being able to carry only three layers of pipe rather than the anticipated six. McDermott claimed that the problems associated with the inadequate boom outreach caused McDermott to incur unexpected delay, forced it to transfer a derrick barge from other duties to complete the unloading, and resulted in damage to the concrete coating on some of the pipe.

The District Court found that McDermott and Torm Denmark had not contracted regarding the outreach of the HIGH SEAS PROMISE's boom, and that, absent an agreement, Torm Denmark's only legal duty was to provide a boom that could reach beyond the side of McDermott's barges, but not to the centerline. The District Court also found that no unreasonable delay was incurred in unloading the HIGH SEAS PROMISE's cargo and that McDer-

mott's concern about damage to the pipe was only an "unsubstantiated fear."

On appeal, McDermott again argues that Torm Denmark agreed to provide a 36-foot boom outreach on the HIGH SEAS PROMISE. McDermott points to the following factors as evidence of this agreement. First, Torm Denmark accepted McDermott's pipe for shipment under a bill of lading calling for offshore delivery, knowing that unloading was to be into McDermott's barges which were 72 feet of beam. Second, in response to McDermott's inquiries, Torm Denmark represented that the HIGH SEAS PROMISE had a 36-foot boom outreach.

The District Court found no evidence of an agreement regarding a specific outreach of the HIGH SEAS PROMISE's boom, and we do not consider that finding to be clearly erroneous. McDermott claimed that it was provided to Torm Denmark or Torm Denmark's local agent in New Orleans an internal McDermott memorandum which set out that "the booms on the [HIGH SEAS PROMISE] should be able to reach out the minimum of 36 feet as the pipe barge at Nigeria [sic] is 210' by 72'." In addition, Johnny Sabild, Torm Denmark's superintendent of cargo in New Orleans, acknowledged at trial that he told McDermott employees that the boom had a 36-foot outreach. But there was no evidence that the need for a 36-foot boom outreach was specifically brought to Torm Denmark's attention at a July 29, 1980 meeting between McDermott and Torm Denmark employees or at any other time, or that Torm Denmark agreed orally or in writing to provide a boom with a 36-foot outreach. We are no more able to find in the record an agreement to provide a 36-foot boom than the District Court was.[2]

2. The following revealing colloquy between Judge Feldman and counsel for McDermott occurred at the close of McDermott's evidence on the counterclaim. It illustrates the tenuous nature of McDermott's claim regarding the existence of an agreement.

THE COURT: You claim on July 19, 1980, Mr. Robinson an employee of McDermott presented to Mr. Warren Sheppard vice president of Kerr [Torm's local agent in New Orleans] a copy of a McDermott interoffice memoran-

dum containing the statement that the HIGH SEA PROMISE [boom] should be able to reach out 36 feet.

COUNSEL: Yes, sir.

THE COURT: What evidence do I have of that?

COUNSEL: None.

THE COURT: Thank you. Next you contend that at the same time Mr. Robinson specifically pointed out to Mr. Sheppard the requirement as to the boom reach hereinabove mentioned. What evidence do I have of that?

■ We also are unwilling to state as a matter of law that, absent an agreement, Torm Denmark was obligated to provide a 36-foot boom outreach to facilitate the unloading of the HIGH SEAS PROMISE into McDermott's barges. While a carrier must properly and carefully discharge the cargo that it transports, this duty by itself does not require the carrier to unload its vessel exclusively for the convenience of the consignee.

The Carriage of Goods by Sea Act requires the carrier to "properly and carefully ... discharge the goods carried." 46 U.S.C. § 1303(2). The Harter Act requires "proper delivery" of the cargo. 46 U.S.C. §§ 190, 191. General principles of maritime law expand on this duty—for traditional dockside delivery, the carrier must "unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee and afford the consignee a reasonable opportunity to come and get it." *Tapco Nigeria, Ltd. v. M/V WESTWIND*, 702 F.2d 1252, 1255 (5th Cir.1983), *quoting*

*F.J. Walker, Ltd. v. M/V LEMONCORE*, 561 F.2d 1138, 1142 (5th Cir.1977), *quoting American President Lines, Ltd. v. Federal Maritime Bd.*, 115 U.S.App.D.C. 187, 188, 317 F.2d 887, 888 (1962).

■ There is a paucity of authority on the subject of discharge into lighters,[3] such as McDermott's barges here, but what authority exists[4] supports Judge Feldman's conclusion that the law imposed no duty on Torm Denmark beyond placing the pipes in McDermott's custody.

When the ship's liability is to cease is usually expressly provided in the bill of lading, *e.g.:* "Ship's responsibility ceases immediately the goods are discharged from the ship's deck"; or "the goods, etc.... as soon as they are discharged over the ship's side shall be at risk of the shipper or consignee"; or "goods at risk of consignee from ship's tackles"; or as in the *London Clause* as above; or "The ship's responsibility ceasing when delivery into lighter when the goods are over the ship's side level with the rail." In

COUNSEL: None.

THE COURT: And that on July 29, 1980, a meeting was held between Torm's representatives and its general agent Kerr and representatives of MCI during which the loading, stowage, and discharge of the HIGH SEA PROMISE was discussed. What evidence do I have of a July 29, 1980 meeting?

COUNSEL: None.

THE COURT: All right. Finally you indicate that prior to sailing Torm, through its agent was provided with a copy of the interoffice memorandum which set out a requirement that Torm's vessel have a boom out reach of 36 feet over the vessel side. What evidence do I have of that?

COUNSEL: That's an uncontested fact, Your honor.

.    .    .    .    .

THE COURT: [You also claim] That Larry Straus a surveyor in the employee of Bach, Rach & Wood acting on MCI's behalf was surveying the stowage of cargo during the loading of the vessel and pointed out to Torm's representative the 36 foot boom reach requirement. Is there any evidence of that?

COUNSEL: No, sir.

THE COURT: So the only thing that we have that is a matter of evidence as the result of an agreement between counsel is that Torm knew that McDermott was asking for a 36 foot boom. Not that there is any—Not that

there was any formal sort of oral agreement which might modify the bill of lading, is that correct?

COUNSEL: That and Captain Sabild's testimony is what we're standing on.

THE COURT: Well, Captain Sabild testified that the vessel had a 36 [foot] boom, didn't he?

COUNSEL: Yes, sir.

THE COURT: And you're standing on that testimony?

COUNSEL: I'm standing on the record, Your Honor.

3. In response to the Court's request, the parties submitted supplemental briefs on this somewhat obscure issue. We commend both parties for their diligent efforts which have been of great help to the Court.

4. McDermott argues that it is erroneous to rely on English authority because the United States recognizes a distinction between "discharge" and "delivery," whereas the English do not. In a case involving the unloading of cargo into lighters, such as the one before us, we see no need to differentiate between "discharge" and "delivery" because the very act of a properly-executed discharge also achieves delivery—i.e., it unloads the cargo, puts it in a place accessible to the consignee (on the consignee's barge), and affords the consignee a reasonable opportunity to get it. *See Tapco Nigeria*, 702 F.2d at 1255.

the absence of any such express provision, the question must be decided by the custom of the port of discharge; and, if no such custom can be proved, the general rule appears to be "that goods are delivered when they are so completely in the custody of the consignee that he may do as he pleases with them," in other words, when they pass from agents of the shipowner to agents of the consignee.

Mocatta, Mustill & Boyd, Scrutton on Charter-parties and Bills of Lading 301–02 (18th ed.1974). The carrier's duty has been phrased even more succinctly by Professor Tetley, a distinguished Canadian professor, maritime practitioner, and authority on cargo law. "[W]hen a consignee sends lighters which it owns or has engaged for the purpose of discharge, the carrier's liability will end at tackle." Tetley & Cleven, "Prosecuting the Voyage," 45 Tul.L.Rev. 807, 826 (1971).

In the English case of *Petersen v. Freebody & Co.*, [1985] 2 Q.B. 294, a shipowner sued the consignees of the cargo for demurrage. He alleged that the delay in unloading the vessel into the consignee's lighter was due to the presence of only two of the consignee's men in the lighter receiving the cargo. Lord Esher stated:

[W]hether it be called a "discharging" or a "delivery," and whatever be the circumstances of the delivery, one party is to give, and the other is to take, delivery at one and the same time, and by one and the same operation. It follows that both must be present to take their parts in that operation. Those parts are, the ship has to deliver and the consignee to take delivery—where? Each has to act within his own department. The shipowner acts from the deck or some part of his own ship, but always on board his ship. The consignee's place is alongside the ship where the thing is to be delivered to him. If the delivery is to be on to another ship, he must be on that ship; if into a barge or lighter, on that barge or lighter; if on to the quay, on the quay. Wherever the delivery is to be, the shipowner, on the one hand, must give delivery. If he merely puts the goods on the rail of his ship, he does not give delivery: that is not enough. If, on the other hand, the consignee merely stands on the other ship, or on the barge or lighter, or on the quay, and does nothing, he does not take delivery. The shipowner has performed the principal part of his obligation when he has put the goods over the rail of his ship; but I think he must do something more—he must put the goods in such a position that the consignee can take delivery of them. He must put them so far over the side as that the consignee can begin to act upon them; but the moment the goods are put within the reach of the consignee he must take his part in the operation. At one moment of time the shipowner and the consignee are both acting—the one in giving and the other in taking delivery; at another moment the joint act is finished. Where goods are slung, and lowered gradually over the side of the ship into a lighter, they cannot all be deposited on the same spot in the same lighter. It is obvious, therefore, that those on board must help in the operation of taking delivery by guiding the thing as it is coming down into the lighter.

In the present case the delivery was of spars; but it was still a joint operation in which each party had to take his part. The shipowner had to get the spars in such a position as that they could be taken out of the ship. He had not completed his part of the operation by merely getting the spar on to the stage; but, when one end of the spar was tipped over the side of the stage so as to come within the reach of the men in the lighter, they had to take their part in the ordinary operation in the ordinary way: they had to assist in getting the spars into the lighter. No custom of the port with respect to the delivery of spars and poles was proved. It was said that, if the consignees' duty was such as I have described, it could not be performed by two men only, and that the evidence shewed that no more than two men were

even sent with a lighter. Whether the duty can be performed by two men, however, depends upon the number of the days in which the operation has to be performed. The consignee must supply enough men to complete the operation within the lay-days; and if two men are not enough, he must supply more. . Here the evidence shewed that at one time there was only one man, and afterwards there were two men, sent with the lighters, and that the delivery was delayed beyond the lay-days because the consignees did not send enough men. The captain complained, and then he did what he was not bound to do—he put some of his own men on to the lighters in order to help to do the work which it was the duty of the consignee to do. By so doing, no doubt, he saved additional demurrage; but it is now contended that he was bound to put his own men on to the lighters, because his duty was to complete the whole operation of getting the spars out of the ship and delivering them into the lighters. I am of opinion that on the true construction of the charterparty it was not his duty. The delivery, under the charterparty, was to be a delivery in the ordinary way a joint operation in which each was to take his part. The lay-days were exceeded because the consignee had not sufficient men on the lighters to perform their part in that operation.

[1895] 2 Q.B. at 297–98.

In the best of American maritime traditions, we adopt this well-reasoned rule of law. Torm Denmark was obligated to remove the pipe from the HIGH SEAS PROMISE's cargo hold and place it on McDermott's barges alongside within the reach of McDermott's stevedores. But Torm Denmark was not obligated to place the pipe in the most efficient configuration aboard the barges nor was it obligated to provide the means to reposition the pipe joints once aboard the barges. Indeed, Sabild testified that there were several ways the pipe could have been stowed aboard the barges to avoid the problems experienced by McDermott, but it was not Torm Den-

mark's responsibility to achieve those configurations.

Whether McDermott ought have contracted more specifically concerning Torm Denmark's duties in unloading the HIGH SEAS PROMISE, we need not decide. As we stated above, the District Court found no evidence of an agreement regarding a 36-foot boom outreach, and we are unable to say that this finding is clearly erroneous. The District Court was correct in ruling that McDermott take nothing on its counterclaim.

AFFIRMED.