Daniel FOURNIER, et al.

v.

PETROLEUM HELICOPTERS,
INC., etc., et al.

PETROLEUM HELICOPTERS, INC.

v.

SUNDSTRAND CORPORATION, et al.

Civ. A. No. 82–2547, 82–4733.

United States District Court,
E.D. Louisiana.

April 8, 1987.

As Amended April 30, 1987.

Richard A. Thalheim, Jr., Thibodaux, La., for Fournier et al.

Kenneth Laborde, McGlinchey, Stafford, Mintz, Cellini & Lang, A.R. Christovich, Jr., Christovich and Kearney, Howard Daigle, Jr., Phelps, Dunbar, Marks, Claverie & Sims, Andrew L. Plauche, Jr., New Orleans, for Petroleum Helicopters Inc., et al.

## MEMORANDUM OPINION

### JURISDICTION

MENTZ, District Judge.

Jurisdiction is established under 28 U.S.C. § 1333.

### BACKGROUND

By agreement, trial was held on the issue of damages only beginning on January 20, 1987, and after submission, the Court requested briefing solely on the question of causation.

Plaintiff was allegedly injured on or about October 23, 1981, when he was a passenger in a helicopter owned and operated by Petroleum Helicopters, Inc. En route to an oil rig in the Gulf of Mexico, the helicopter encountered bad weather and experienced engine trouble. As a result of engine failure, the pilot put the helicopter into "auto-rotation" [1] at a height of about eight hundred feet, landing on 8–10 foot seas, with 20–30 feet between wave crests. The 35 MPH wind was beneficial to the landing and there was no damage to the helicopter. The experienced pilot testified that there was no real impact but he could, of course, feel the helicopter hit the water. This version of the incident was confirmed, in pertinent part, by Kerman LeBlanc, also a passenger in the helicopter. Plaintiff, however, characterizes the landing as a "crash", and at various times has elaborated on the degree of the event and the subsequent conditions.

---

1. Auto-rotation is the procedure in which a helicopter uses the air current caused by the descent to turn the blades, thus allowing the pilot control of the aircraft.

It took two hours for a rescue boat to arrive. During this time, the helicopter "rolled" with the waves, and was subjected to winds and high seas. The craft was equipped with inflatable pontoons which kept it afloat, although there was testimony that the pilot was concerned the pontoons would not hold up for an extended period. The pilot and passengers were required to transfer to the rescue vessel by means of a guide rope. This necessitated that they enter the water. Neither the pilot nor the other passenger were injured in this incident.

Plaintiff was taken to the Abbeville General Hospital for a check-up following the rescue and the report states "no pain and didn't get hit anywhere, patient denies injuries," with diagnosis of no injuries by Dr. J.T. Kennedy. (Defendant Ex. 1).

Defendant Exhibit 5 shows that plaintiff went to Dr. Bryan Hemard on October 26, 1981 for an eye exam and to obtain new eyeglasses. Dr. Hemard reported that the plaintiff was not upset about the accident, even though "he said that he was in the water for 24 hours." Plaintiff returned to work until December 11, 1981, and then consulted Dr. Crenshaw.

The plaintiff had continued to work during November and December of 1981. Mr. Fournier successfully performed his duties on the rig during this time. Earl Prosper, Mr. Fournier's supervisor, testified that the plaintiff never complained of any ailments during the seven to eight weeks after the accident. Further, Mr. Prosper did not detect any physical manifestations of an injury.

Dr. Crenshaw, a family physician, first examined plaintiff on December 15, 1981 for "problems in the chest". The doctor ordered an electro-cardiogram (EKG) which proved normal. The doctor testified that the plaintiff demonstrated an "anxiety neurosis" because he felt his job was in jeopardy due to the helicopter crash. Dr. Crenshaw referred plaintiff to an internist for a treadmill test and cardiac evaluation. On January 6, 1982, after receiving Dr. Henry's treadmill test results, the plaintiff alleged for the first time that he had complaints as to his neck and lumbar region. The diagnosis was lumbar-sacral strain.

Plaintiff then consulted Dr. Haydel on January 11, 1982. After a complete physical exam, Dr. Haydel found no symptoms of orthopedic injury. The only positive finding was a fast heart rate and a complaint of chest pain.

However, Dr. Haydel referred plaintiff to Dr. Dexter Gary, a local orthopedic surgeon, who related that plaintiff complained about both hips, both shoulders, his neck and low back. Relative to the neck, there was a complete normal range of motion, no spasm, and a normal exam as to neck and shoulders. The back exam showed a full range of motion, without spasm, and no evidence of radiculopathy. His reflexes were intact and the straight leg raising test negative. His clinical evaluation of the low back was normal. The diagnosis was "mild myalgia" (muscle pain). The doctor noted "it was subsequent to these chest pains and headaches that he began having other multiple joint complaints." The doctor did not perceive any significance in the helicopter crash, as the plaintiff was able to continue working for two regular hitches after the accident. On January 18, 1982, plaintiff returned and brought his x-rays of the cervical spine. Dr. Gary felt that they showed minimal degenerative changes compatible with Mr. Fournier's age, with a sacralization at $S-_1$ (genetic-no clinical significance) and a slight narrowing of $L-_5$ disc space. These symptoms were deemed compatible with plaintiff's age and occupation, and had no significance based on a normal clinical exam. The diagnosis was "no indication of significant trauma to neck or back. No return appointment was given."

At this point, plaintiff's attorney arranged for him to see Dr. Watermeier of New Orleans which he did on January 27, 1982. The diagnosis provided was an "aggravation of arthritis in spine." A return visit on February 1, 1982, for complaints of problems in the low back area, resulted in a myelogram which showed no evidence of problems except for what was noted to be a ventral indentation of $L_4$–$L_5$ vertebra.

While the EMG test was normal, the doctor did a nerve block which was positive at $L_4$–$L_5$. In Exhibit Defendant 9, (his deposition), Dr. Watermeier was asked

"Did you find any objective evidence of some problem in the lumbar area?"·

Answer: No objective evidence.

The plaintiff was then admitted to the St. Charles General Hospital on February 14, 1982, and had surgery February 19, 1982.[2] Dr. Watermeier noted, when asked about "looking further," that "the only way you can look further is sometimes with an operation to directly look." (Deposition Page 153).

For reasons never satisfactorily explained to the Court, Dr. Watermeier deemed this surgery appropriate. Over the next several years, the plaintiff was subjected to numerous surgical procedures, to wit:

February 14, 1982 [3]—lumbar laminectomy

January 5, 1983—cervical anterior fusion

May 6, 1983—lumbar fusion and laminectomy

October 23, 1984—Morphine epidural

May 19, 1985—cervical anterior fusion

November 14, 1985—Morphine epidural

March 10, 1986—sympathectomy and epidural

September 29, 1986—Morphine epidural

Dr. Richard Warren Levy, a well recognized expert in neuro-surgery, testified at trial and stated that with the date of the accident being October 23, 1981, and eleven and one-half weeks having passed before the advent of symptoms, that the accident was not the cause of plaintiff's spine problems. He further noted that his first complaint of neck pain was on August 30, 1982, some ten months after the helicopter incident. With a disc injury, the symptoms would appear within 48–72 hours, and five days would be the outside limit within the realm of medical probability. Accordingly, the disc injury must have occurred through some other incident, such as a simple twist, a heavy cough, or even picking up a newspaper.

Dr. Levy reviewed the EMG, myelogram, and radiculogram (nerve block test) of Dr. Watermeier, and stated that a lumbar laminectomy was not indicated. Further he stated that a bulging disc does not cause compression on the nerve.

In light of the foregoing, the following are the Court's findings of fact and conclusions of law. To the extent that any findings of fact are conclusions of law, they are adopted as such; to the extent that any conclusions of law are findings of fact, they are so adopted. For the purposes of this opinion, the only issue to be addressed is the causation of plaintiff's injuries.

### FINDINGS OF FACT

#### I.

Mr. Fournier is presently experiencing a significant degree of pain, which amounts to an almost total disability.

#### II.

Prior to the helicopter incident on October 23, 1981, the plaintiff was in average health, experiencing only the normal degenerative and arthritic conditions in his back and neck which would be expected for a man of his age and occupation.

#### III.

The helicopter landing, while more severe than normally experienced, was not a "crash," nor was the plaintiff subjected to conditions which could be deemed extraordinary in nature. A video-tape of a helicopter landing by "auto-rotation" demonstrated the manner in which an "auto-rotation" landing is made.

#### IV.

The plaintiff did not exhibit any objective clinical symptoms indicative of a back or neck injury in the several months following the incident. While Mr. Fournier may have

---

**2.** Neither insurance company nor employer was advised of the anticipated surgery, the cost of which was guaranteed by Attorney Thalheim.

**3.** Above dates refer to first day of hospitalization.

been experiencing some degree of pain, the evidence established that this was most likely due to muscular strain.

## V.

None of the several local doctors examining Mr. Fournier between the time of the incident and the time of the first surgery detected any objective manifestations which would indicate that the plaintiff's back or neck had been injured. These doctors were selected by plaintiff. The only doctor to note any condition out of the ordinary was Dr. Watermeier, who performed the surgery after being selected by plaintiff's attorney. The first examination by Dr. Watermeir found nothing significant, and the second examination revealed, at best, only suspect symptoms.

## VI.

Since the time of that initial surgery, the plaintiff's physical and mental condition have seriously deteriorated. None of the surgical procedures appear to have aided Mr. Fournier; on the contrary, he is worse now than before the series of operations. Psychiatric care by Dr. Oliver Sanders has not returned the plaintiff to his pre-surgical mental condition.

## CONCLUSIONS OF LAW

### I.

To prevail in this matter, the plaintiff must establish, by a preponderance of the evidence, that the defendants' negligence [4] was the legal cause of his injuries.

### II.

■ In a maritime tort case, the Court relies on general principles of negligence law. *Daigle v. Point Landing, Inc.*, 616 F.2d 825 (5th Cir.1980).

### III.

■ According to W. Page Keeton, Prosser and Keeton on Torts, 263, 269 (5th Ed. 1984),

An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection usually is dealt with by the courts in terms of what is called "proximate cause" or "legal cause."

On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant. (footnote omitted).

This standard mirrors the typical jury charge in a case such as this. Were this a jury case, the Court would have instructed the jury in a manner similar to the following:

You are not to award damages for any injury or condition from which the plaintiff may have suffered, or may now be suffering, unless it has been established by a preponderance of the evidence in the case that such injury or condition was proximately caused by the accident in question. An injury or damage is proximately caused by an act, or failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage; and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.

Indeed, not only is this standard applicable in a general maritime law case, but would

---

**4.** Since this matter was tried solely on the issue of damages, the Court pretermits a finding of negligence, and assumes for the sake of discussion that the defendants were negligent.

be appropriate in a state law claim for negligence. *See, e.g., Dixie Drive It Yourself System v. American Beverage Co.,* 242 La. 471, 137 So.2d 298 (1962).

## IV.

 Thus, the plaintiff bears the burden of proving that the landing of the helicopter on turbulent seas and the resulting period wherein the plaintiff was "riding the waves" in the helicopter while waiting for rescue, and the eventual transfer to the rescue vessel, caused the injuries of which he now complains. This he has not done.

## V.

A review of the facts herein indicate that there are *several* plausible explanations for the current debilitated state of the plaintiff. While the Court will not engage in speculation as to exactly which explanation it feels is the most plausible, the Court does not view the helicopter incident as having been such. The plaintiff has failed to establish the crucial link between his back and neck problems and the October 23, 1981 emergency landing.

Had the plaintiff evidenced back or neck injury symptomatology in the days following the incident, the Court might have been inclined to find causation. However, the earliest credible complaint of such was January 6, 1982, more than two months after the incident. Further, the record does not reflect at any time that there were reliable medical indications that the plaintiff had been injured on October 23, 1981.

## VI.

In sum, the record reflects that the plaintiff has failed to carry his burden that his injuries are the result of the helicopter emergency landing. Since the plaintiff has not established the vital link between negligence and damages, whether the defendants, or which among them, were negligent, or the quantum of the plaintiff's damages is irrelevant. Accordingly, judgment will be entered in favor of the defendants,

dismissing the claims of the plaintiff with prejudice.