**VULCAN MATERIALS COMPANY and U.S. Fire Insurance Co.**

v.

**VULICA SHIPPING CO., LTD.**

Civ. A. No. 92–2050.

United States District Court, W.D. Louisiana, Lake Charles Division.

Aug. 2, 1994.

James M. Tompkins, New Orleans, LA, for plaintiff.

Francis X. Neuner, Jr., Lafayette, LA, for defendant.

### FINDINGS OF FACT AND CONCLUSION OF LAW

EDWIN F. HUNTER, Jr., Senior District Judge.

On November 17–18, 1991, eighteen thousand tons of limestone aggregate slid into the industrial canal at Lake Charles, Louisiana.[1] This lawsuit ensued. The matter was submitted to the court by way of bench trial on March 29 and 30, 1994. Having considered all the evidence and applicable law, the court rules as follows:

### FINDINGS OF FACT

1. Originally, listed as plaintiffs in this matter were Vulcan Materials Company and United States Fire Insurance Company. Several months after original filing, Vulcan/ICA Distribution Company was substituted in place of Vulcan Materials Company.

2. Vulcan/ICA Distribution Company (hereinafter, "Vulcan/ICA") is a New Jersey corporation whose primary business involves shipping various grades of crushed limestone aggregate from Mexico to various U.S. ports. The United States Fire Insurance Company provided insurance coverage for the cargo which forms the subject matter of this litigation. The original defendants in this suit included Vulica Shipping Company, Ltd. (hereinafter, "Vulica Shipping"), and Port Aggregates, Inc. (hereinafter, "Port Aggregates").[2]

3. Vulica Shipping is a foreign entity organized and existing under the laws of a foreign state. Vulcan Gulf Coast Materials Compa-

---

1. After exposure to water, the limestone no longer met the necessary specifications for use in highway construction. Dredging and removal expenses were also incurred as a result of the incident.

2. Port Aggregates filed a cross-claim against Vulica Shipping. Vulica Shipping in turn filed a cross-claim against Port Aggregates.

ny, the original plaintiff in this suit, owns 50% of Vulica Shipping.[3]

4. Shortly before trial, plaintiffs, Vulcan/ICA and United States Fire Insurance Company, settled with defendant, Vulica Shipping. All rights which plaintiffs were entitled to assert against Port Aggregates (as set forth in the pleadings and filings) were assigned to Vulica Shipping. In exchange, plaintiffs' claims against Vulica Shipping and the M/V W.H. BLOUNT were dismissed.

5. Port Aggregates is a Louisiana-based corporation whose principle business involves the distribution of limestone aggregate. At all relevant times, Port Aggregates operated a facility on the Industrial Canal Turning Basin at Lake Charles, Louisiana. At that site, Port Aggregates received deliveries of various grades of limestone aggregate. The material was exhumed from mines in Mexico, and delivered to Lake Charles, Louisiana, aboard vessels chartered by Vulcan/ICA.[4]

6. Port Aggregates' Lake Charles facility consisted of four acres of land adjacent to the Industrial Canal Turning Basin. The facility is rectangular in shape, and is bounded on one side by water. The shoreline bank is unreinforced, lacking a retaining wall or bulkhead. The Port of Lake Charles stepdredged the water adjacent to the facility to a depth of 40 feet.[5]

7. The land comprising the facility previously was covered with spoil from past dredging operations. By the time Port Aggregates leased the land, however, the spoil had been removed and the land compacted. In preparation for establishing their facility, Port Aggregates covered a section of land with a geotextile fabric which formed a separation barrier between the soil and limestone base.

A layer of limestone was placed over this fabric. The fabric acted as a stabilizer, equally distributing the load of the tremendous weight it was required to bear.

8. The geotextile fabric was designed and intended as a primary landing area for the limestone, and was referred to as the "pad". Rectangular in shape, the pad paralleled the shore for approximately 400–500 feet. The front edge of the pad and the water were separated by a distance of 25–30 feet. Along this border between the pad and the water was a road used by trucks and loading equipment to access the piles of aggregate. The onset of grass delineated the boundaries of the pad.[6]

9. Port Aggregates utilized four breasting barges configured in a "T" shape to facilitate the docking and unloading of cargo from deep-draft, ocean-going ships. The barges were configured such that one barge rested parallel to the shore. Immediately next to that barge was another barge placed side by side on the outside of the first barge. Finally two more barges were connected end to end, parallel to the shore, and adjacent to the first two barges. As a ship discharged cargo, its draft decreased, one of the barges was removed, and the ship maneuvered closer to shore, allowing it to discharge aggregate farther inland.

10. Daniel Nemirovsky, the operations manager for Vulica Shipping, and Cliff Kirkmeyer, vice president and general manager of Vulcan/ICA, were involved in the design and approval of the Port Aggregates' facility. Moreover, Nemirovsky established the breasting barge system and approved the mooring devices. On seven previous occasions prior to the underlying incident, aggregate had been successfully delivered by ves-

---

3. Vulcan Gulf Coast Materials Company also owns 50% of the substituted plaintiff, Vulcan/ICA. It could be said that plaintiff, Vulcan/ICA, and defendant, Vulica Shipping, were "half-sisters" (this term was coined by Cliff Kirkmeyer, vice president and general manager for Vulcan Gulf Coast Materials and vice president and general manager of Vulcan/ICA).

4. Vulcan/ICA's cargo is principally carried by Vulica Shipping.

5. This does not mean that immediately upon stepping off the bank the water is 40 feet deep. Rather, in a series of increments, the depth gradually reaches 40 feet.

6. The pad had previously incurred no problems supporting the considerable weight of limestone aggregate. The pad previously sustained individual piles of aggregate totaling 80–90,000 tons. During the contract period, a total of 850,000 tons of aggregate were successfully discharged onto the pad without mishap.

sels chartered by Vulcan/ICA, including the W.H. BLOUNT. There were no cargo placement problems associated with any of the previous discharges. Furthermore, after the incident in question, approximately ten more shipments were received by the facility without mishap.

11. On May 1, 1990, Port Aggregates entered into a sales agreement (hereinafter referred to as, "the Sales Agreement") with Vulcan/ICA for the purchase of "materials", including limestone aggregate. The initial term of the Sales Agreement extended through, and including, December 31, 1994, unless terminated sooner pursuant to the contract. In November, 1991, in accordance with the Sales Agreement, Vulcan/ICA shipped several grades of limestone aggregate to the Port Aggregates' facility in Lake Charles.

12. The limestone was transported aboard the M/V W.H. BLOUNT, a bulk carrying vessel owned by Vulica Shipping. The vessel is equipped with a 250 foot boom/conveyor system which removes aggregate from the holds of the vessel and deposits it on shore. The boom is fixed along the center line of the main deck; it is able to swing out ninety degrees on either side. The conveyor system discharges cargo at a rate of approximately 5,000 tons per hour.

13. On November 12 and 13, 1991, the M/V W.H. BLOUNT loaded three grades of limestone aggregate in Cozumel, Mexico, and sailed for Lake Charles, Louisiana. The M/V W.H. BLOUNT arrived at the Port Aggregates facility on November 15, 1991. The ship's draft at the time of arrival was approximately 38 feet. Due to the shallow water depth, it was necessary to use two tugs to push the vessel laterally until she came along side the two barges.

14. After securing its mooring lines, the vessel commenced discharge of 610–grade limestone aggregate at approximately 2015 hours. The first mate of the M/V W.H. BLOUNT gave Port Aggregates personnel a hand-held radio which allowed two-way communication between the ship and shore. Andrew and James Guin, owners of Port Aggregates, were present on shore to supervise the unloading. The crew of the BLOUNT informed the Guins that the ship was under orders to discharge the cargo and depart the facility within twelve hours.

15. On the evening in question, as customarily done, the area on the pad where the limestone was to be deposited was marked by surveyor's stakes and tape. The discharge area was well lit by lights from the BLOUNT. The following day, the stakes were removed to avoid personal injury and/or damage to the moving equipment.

16. Initially, discharge operations proceeded smoothly. As the unloading continued, the Guins noticed that the ship did not rise in the water as her load lightened. Also, after 1½ to 2 hours, the vessel began to list to port and edge away from the breasting barges.[7] As the ship began to list, the arm of the boom dipped, thus decreasing its reach. As a result, the pile of aggregate began accumulating off the pad and closer to the water. At this point, the Guins contacted the vessel and instructed them to move closer to the bank. The vessel replied that it was sitting on the bottom and was unable to move closer to shore. This exchange continued back and forth while the discharged material continued to inch closer and closer to the water. Eventually aggregate began to trickle into the water, at which time the Guins instructed the vessel to stop discharging. The vessel continued to discharge. Finally, the Guins boarded the ship by means of a personnel basket.[8] Once aboard, the Guins noticed that water was spewing out of the ballast overflows on the port side of the vessel. The first mate denied that the water was ballast. The Guins point-blankly commanded the first mate to stop discharging, which he then did. However, a little over one hour passed between when the Guins originally instructed the ship that there was a problem with the discharge, and when the ship finally halted

---

7. The port-side of the vessel faced shore.

8. This method was required, since the ship had moved too far away from the breasting barges to

the unloading procedure.[9]

17. After initially telephoning Dan Nemirovsky, and informing him of the ongoing problem with the discharge of the BLOUNT's cargo, Nemirovsky returned the call and told the Guins that the problem had been solved. Shortly thereafter, the ship began to rise on the port side, even though she was not discharging any cargo.

18. We find that the W.H. BLOUNT took on ballast while discharging, in an attempt to increase the turnaround time. We further find that the increased ballast on the port side caused the boom to lower and the aggregate to be placed in an area between the pad and the shore. Aiding us in this conclusion is the fact that the ship's list was corrected shortly after Nemirovsky contacted the vessel. Also, seventeen other ships, of similar size, off-loaded their cargo at the facility without mishap.

19. After correcting the list and resuming discharge, no additional problems were encountered during the unloading process. At 1430 hours on Saturday, November 16, 1994, the W.H. BLOUNT completed unloading and departed the Port Aggregates facility. At that time, the Port Aggregates personnel also left the facility and did not return for the remainder of the weekend.

20. Sometime between late Sunday evening and the early hours of Monday morning (November 17–18) a section of the bank holding the improperly placed aggregate slid into the water. 18,771.75 tons, out of a total cargo of approximately 55,000 tons, was lost.[10]

21. After learning of the slide, Port Aggregates' personnel used the limited equipment on site to remove the remaining aggregate which lay in a precarious position off the pad.

22. At no time did Port Aggregates' personnel request that the BLOUNT relocate the improperly placed cargo onto the pad. Even if such a request had been made, the BLOUNT had no means of readjusting the cargo once it had been placed on shore. Moreover, we find that Port Aggregates did

not have the equipment necessary to move the material which eventually slid into the water to a safe position prior to the slide. Only a backhoe and a front-end loader were located at the facility. Furthermore, since the Louisiana Department of Weights and Standards is closed during the weekend, it would have been impossible to secure a permit to allow Port Aggregates to transfer additional heavy equipment to the site prior to the slide.

23. In separate letters dated November 20, 1991, and March 31, 1992, Daniel Nemirovsky of Vulica Shipping expressed his dissatisfaction to the company which supplied the crew for the BLOUNT. Nemirovsky noted that the vessel placed too much emphasis on turning the vessel around in as short a period as possible, which resulted in little communication with the customer and improper depositing of the cargo. Nemirovsky stated that the cargo should never have been allowed to "get close enough to actually go into the water". Nemirovsky also noted in one of his letters that four previous shipments to the Lake Charles facility had been on the BLOUNT, and that the vessel should have had enough experience to appropriately handle the situation. Nemirovsky pointed out that aggregate had never been placed that close to shore previously, which was readily apparent from the vessel by observing existing piles of aggregate.

24. Previously transmitted to the crew of the BLOUNT by Port Aggregates was a map of the facility, marking the position of the ship, the breasting barges, and the intended discharge locations for the aggregate. Conspicuously absent from the map, however, are the varying water depths and the crucial need for the ship to continue to lessen its draft in order to move closer to shore. Moreover, there is no indication in the record that Port Aggregates personnel informed the crew of the ship upon arrival of the need to abstain from ballasting so that the ship could move in closer to shore. This does not ab-

use the gangway.

9. Approximately 150 to 200 tons of material fell into the water during the discharge operations.

10. Once immersed in water, the limestone became useless, as it did not meet the specifications required by the highway department.

solve the crew, however, since common sense, as well as experience, should have told the ship's crew of the need to decrease draft in order to move closer to shore.

25. At trial, the parties stipulated to damages as listed in Port Aggregates' exhibit F. The limestone loss of 18,771.75 tons is estimated at $136,085.19; dockage and port fees total $4,692.94; dredging—$32,392.96; disposal—$31,764.53. Totaling these figures, we reach the sum of $204,935.62. Previously, Port Aggregates received a credit from Vulcan/ICA in the amount of $190,788.13. This credit is a deduction that Vulcan/ICA granted Port Aggregates as a result of the lost material.

26. Insofar as these Findings of Fact also constitute Conclusions of Law, they are adopted as such.

### CONCLUSIONS OF LAW

1. This matter arises under the court's admiralty and maritime jurisdiction. 28 U.S.C. § 1333; Fed.R.Civ.P. 9(a). Venue is proper in the Western District of Louisiana.

■ 2. "An assignment takes place when a third party pays off the creditor directly and is subrogated in the creditor's rights in the debt and lien. Assignment should be in writing and notice thereof should be given to the debtor." *Tramp Oil & Marine Ltd. v. M/V MERMAID I*, 630 F.Supp. 630, 634 (D.P.R.), *affirmed*, 805 F.2d 42 (1st Cir.1986).

3. "Once subrogation is recognized, it carries with it all of the rights which the subrogor had." *Compania Anonima Venezolana De Nav. v. A.J. Perez Export Co.*, 303 F.2d 692, 696 (5th Cir.), *cert. denied*, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962).

■ 4. In the context of maritime liens, the assignee stands "in the shoes" of the assignor provided there is no close relation-

ship between the owner and the assignee. *Tramp Oil & Marine, Ltd., supra.*

■ 5. The carriage of limestone aggregate by Vulica Shipping pursuant to an agreement between the parties, constituted an example of private carriage. Contracts of private carriage are governed by the general maritime law and the contracts of the parties. *See EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 721 (1st Cir.1984).[11]

#### A. *Vulcan/ICA's Claim Against Port Aggregates*

■ 6. We hold that due to the contractual relationship between Vulcan/ICA and Port Aggregates, liability for the lost limestone is properly determined according to the provisions of the Sales Agreement.

7. "Under admiralty law, where the parties have included a choice of law clause, [in their contract] that state's law will govern unless the state has no substantial relationship to the parties ..." *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514 (5th Cir.1988). In paragraph 14.5 of the Sales Agreement, the parties stipulated that the contract should be construed in accordance with the laws of the State of Louisiana. Louisiana has a substantial relationship to the parties (who do considerable business here) and the underlying incident. We therefore apply Louisiana law in our analysis of the Sales Agreement.

8. In Invoice # 6804, Vulcan/ICA granted Port Aggregates a credit in the amount of $190,788.13 as a result of the limestone loss. Vulcan/ICA now seeks to recover this amount from Port Aggregates which it had previously written off. We discuss this claim in connection with pertinent provisions of the Sales Agreement:[12]

9. Section 5.3 of the Sales Agreement provided that, "title and risk of loss to all Mate-

---

**11.** Neither the bill of lading nor other relevant evidence was produced by either party such as to determine whether the provisions of the U.S. Carriage of Goods By Sea Act, ("COGSA") 46 U.S.C. § 1300, *et seq.* or the Harter Act, 46 U.S.C. § 190, *et seq.* are applicable in this case. Neither party argues that COGSA or the Harter Act specifically govern the standard of care in this case.

**12.** Any suggestion that Vulica Shipping is not bound by the credit granted by Vulcan/ICA, is unfounded. The assignee cannot enjoy the fruits of the assignment without also incurring the bitter taste of the assignor's obligations.

rials," devolved upon Port Aggregates upon unloading the materials at the delivery site.

10. Section 5.4 contained a caveat which stated that failure of materials to conform to the specifications must be made known to Vulcan/ICA by written notice within five days of receipt. We quote in pertinent part from Section 5.4 of the Sales Agreement:

> If Port Aggregates fails to give proper and timely notice of rejection, then the delivery and the materials shall be deemed to conform with the terms of this agreement, and Port Aggregates shall be bound to accept and pay for the materials in accordance with the terms of this agreement. Failure to give notice of rejection in accordance with this Section 5.4 shall constitute a waiver of all claims with respect to the material.

Port Aggregates did not provide written notice to Vulcan/ICA until November 22, 1991,—*six* days after delivery. Thus, the notice of rejection was ineffective, and the $190,788.13 credit taken by Port Aggregates as a result of the loss was improper. However, the credit was authorized and approved by Vulcan/ICA.

11. Louisiana Civil Code Article 1301 obligates one who receives something not due him whether through error or knowingly, to restore it to whom he improperly received it. Louisiana Civil Code Articles 2302 and 2303 further provide:

> Art. 2302   He who has paid through mistake, believing himself a debtor, may reclaim what he has paid.
> Art. 2303   To acquire this right, it is necessary that the thing paid be not due in any manner, either civilly or naturally. A natural obligation to pay will be sufficient to prevent the recovery.

13. Had Port Aggregates timely notified Vulcan/ICA of the defect in the materials or improper discharge, then Port Aggregates would have been entitled to the credit. This is analogous to a prescriptive period.

14. Vulcan/ICA's total liability to Port Aggregates is limited to the cost of replacing the material—$136,085.19. In this regard, we specifically note paragraph 7.3(b) of the Sales Agreement:
> Notwithstanding anything to the contrary in this Agreement or otherwise, Vulcan/ICA's total liability for any claims of any kind, whether

12. The Civil Code articles on natural obligations state that, "A natural obligation is not enforceable by judicial action. Nevertheless, whatever has been freely performed in compliance with a natural obligation, may not be claimed ..." La.Civil Code Art. 1761. Examples of natural obligations include obligations extinguished by prescription or bankruptcy. La.Civil Code Art. 1762.

13. We conclude that the credit which Vulcan/ICA granted Port Aggregates reflected a natural obligation which cannot be recovered.[13] However, the natural obligation only extended to the sum necessary to replace the stone loss—$136,085.19.[14] Accordingly, Port Aggregates is obligated to return the difference between the credit amount—$190,788.13 and the natural obligation—$136,085.19, for a difference of $54,702.94.

14. There is no evidence of bad faith on behalf of Port Aggregates in withholding the excess credit amount. Therefore, no interest is due. La.Civil Code Art. 2311.

### B.   Tort Claims

15. We are not aware of any contractual arrangements between Port Aggregates and Vulica Shipping, nor has any agreement between Vulcan/ICA and Vulica Shipping been introduced into evidence. Accordingly, any liability between the parties must be analyzed under general maritime law.

16. Adopted as American Maritime Law by the Fifth Circuit is the following excerpt from the English case of *Petersen v. Freebody & Co.*, [1985] 2 Q.B. 294:

> [W]hether it be called a "discharging" or a "delivery," and whatever be the circumstances of the delivery, one party is to

in warranty, contract, tort, or otherwise, incident to this agreement, the Materials, any order placed by Port Aggregates, and/or Vulcan/ICA's performance under this Agreement, including, without limitation, any claim(s) arising out of defects or alleged defects in Materials, shall in no case exceed costs of replacement of the Materials, or the portion thereof, which give rise to the claim(s) or repayment of (or credit for) the purchase price applicable to the Materials, or the portion thereof, which give rise to the claim(s), which ever is less.

give, and the other is to take, delivery at one and the same time, and by one and the same operation. It follows that both must be present to take their parts in that operation. Those parts are, the ship has to deliver and the consignee to take delivery—where? Each has to act within his own department. The shipowner acts from the deck or some part of his own ship, but always on board his ship. The consignee's place is alongside the ship where the thing is to be delivered to him. If the delivery is to be on to another ship, he must be on that ship; if into a barge or lighter, on that barge or lighter; if on to the quay, on the quay. Wherever the delivery is to be, the shipowner, on the one hand, must give delivery. If he merely puts the goods on the rail of his ship, he does not give delivery: that is not enough. If, on the other hand, the consignee merely stands on the other ship, or on the barge or lighter, or on the quay, and does nothing, he does not take delivery. The shipowner has performed the principal part of his obligation when he has put the goods over the rail of his ship; but I think he must do something more—he must put the goods in such a position that the consignee can take delivery of them. He must put them so far over the side as that the consignee can begin to act upon them; but the moment the goods are put within the reach of the consignee he must take his part in the operation. At one moment of time the shipowner and the consignee are both acting—the one in giving and the other in taking delivery; at another moment the joint act is finished ...

*A/S Dampskibsselskabet Torm v. McDermott, Inc.,* 788 F.2d 1103, 1109 (5th Cir.1986).

17.  General maritime law requires that a carrier, "unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it." *Crisis Transportation Co. v. M/V ERLANGEN EXPRESS,* 794 F.2d 185, 188 (5th Cir.1986).

18.  "The common law requirements of proper delivery are modified by the custom, regulations, or law of the port of destination." *Tapco Nigeria, Ltd. v. M/V WESTWIND,* 702 F.2d 1252, 1258 (5th Cir.1983). Delivery is improper "if the risks to which a particular shipment were subjected were unusual in relation to the risks ordinarily involved in making delivery as required by the usage or law of the port." *Tapco Nigeria, Ltd., supra.*

■ 19.  A tort under maritime law is defined in accordance with general principles of negligence law. *Consolidated Aluminum Corp. v. C.F. Bean Corp.,* 833 F.2d 65, 67 (5th Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *Casaceli v. Martech International, Inc.,* 774 F.2d 1322, 1328 (5th Cir.1985), *cert denied,* 475 U.S. 1108, 106 S.Ct. 1516, 89 L.Ed.2d 914 (1986).

20.  An actor must act reasonably under the circumstances. Restatement Second, Torts § 283 (1965).

21.  The experts in this case agree, as do we, that it is the responsibility of the vessel to maintain correct trim and to ensure safe and proper discharge operations.

22.  In order to recover under negligence, the following elements must be present,

1.  A duty, or obligation requiring a person to conform to a certain standard of conduct,

2.  A breach of the duty, or failure to conform to the prevailing standard of conduct,

3.  Proximate cause—a reasonably close connection between the conduct and the resulting injury,

4.  Actual loss or damage.

W. Page Keeton, Prosser and Keeton on Torts, 263, 269 (5th Ed.1984).[15]

23.  We find that each of the elements necessary to establish a claim in negligence have been met with regard to the conduct of both Port Aggregates and Vulica Shipping. Both parties failed to conform to the neces-

---

**15.**  Prosser and Keeton is a proper source for general principles of negligence law. See, *Fournier v. Petroleum Helicopters, Inc.,* 665 F.Supp. 483, 486 (E.D.La.1987), *affirmed,* 845 F.2d 1020 (5th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

sary standard of conduct for the protection of an unreasonable risk.

24. A court sitting in admiralty apportions damages in accordance with principles of comparative negligence. *M & O Marine, Inc. v. Marquette Co.,* 730 F.2d 133, 136 (3d Cir.1984); *Prudential Lines, Inc. v. McAllister Bros., Inc.,* 801 F.2d 616, 621 (2d Cir.1986).

25. On all previous cargo deliveries, Keith Peavy of Vulcan/ICA was present as a liaison between Port Aggregates and the ship. Peavy supervised the unloading operation from the shore, via radio. Vulica Shipping's expert, David Scruton, testified that it was standard marine practice for the facility to post a representative on board the ship to direct the unloading operations. Port Aggregates' expert, David Davenport, testified that the proper place to direct the operations was from shore. Moreover, the practice of Vulcan/ICA's own agent, Peavy, was to direct operations from shore. We find that Port Aggregates was not negligent in conducting its supervision of the unloading process from shore.[16]

26. We find that Port Aggregates was under no duty to maintain additional equipment at the facility. The contract between Vulcan/ICA and Port Aggregates required Port Aggregates to have equipment "necessary for the unloading and receiving of materials". However, we construe this provision to merely require Port Aggregates to have the capability to properly receive cargo from the ship. The facility was an "open pile" facility, and no additional or special equipment was required.[17] Even if Port Aggregates had used its limited equipment at the site to relocate improperly discharged material, this process would have taken four to five days. It would not have been completed in time to prevent the slide. We find that neither Port Aggregates, Vulcan/ICA, nor Vulica Shipping, were at fault for failing to take remedial measures after the improper discharge, but prior to the slide.

27. We find that the construction of the pad and the docking facility, together with the breasting barge arrangement was not at fault in this accident. High ranking representatives of both Vulcan/ICA and Vulica Shipping (Kirkmeyer and Nemirovsky) either took part in the design of the facility or approved it. Moreover, this was the only ship which incurred any type of difficulty in the discharge process.

28. We find that the sole cause of the aggregate slide was the improper discharge of limestone off the pad and onto the unsupported roadway between the pad and the water. The improper discharge was caused by the crew of the M/V BLOUNT taking on ballast too quickly in an effort to decrease the amount of "turn-around" time. We find that Port Aggregates was slightly at fault for failing to initially notify the crew not to take on ballast until a sufficient amount of ship's cargo had been unloaded such that the ship could be moved in closer to shore. This negligence did not excuse the crew's duty to perceive this need on their own, nor their failure to heed and promptly respond to instructions from shore once they were issued.

29. Accordingly, ninety percent fault is attributed to Vulica Shipping for its role in this accident. Ten percent fault is assessed against Port Aggregates.

30. After Port Aggregates reimburses Vulcan/ICA for the amount improperly deducted as a credit, Port Aggregates will have sustained an unreimbursed loss of $68,850.43 ($204,935.62.—$136,085.19) (total loss—credit for stone loss granted by Vulcan/ICA). Of that amount, Vulica Shipping must reimburse Port Aggregates ninety percent, or $61,965.39. Of the $136,085.19 claim (credit given Port Aggregates) which Vulcan/ICA has against Vulica Shipping, Port Aggregates

---

**16.** We note that David Scruton's testimony concerning this issue was contained in a report revealed only several days before trial. At trial, counsel for Port Aggregates objected to the introduction of new testimony at such a late date. In an effort to explain the surprise, counsel for Vulica Shipping argued that the new testimony constituted rebuttal evidence. We need not rule in Port Aggregates favor concerning this objection, because even after giving due consideration to Scruton's testimony on this issue, we find it unpersuasive.

**17.** At other facilities, Port Aggregates does maintain receiving equipment, such as hoppers.

must contribute ten percent or $13,608.52. After all adding and subtracting is done, Port Aggregates owes Vulica Shipping the net sum of $6,346.07 [ ($54,702.94 + 13,608.52) − 61,965.39] [ (excess credit returned to Vulcan/ICA + ten percent contribution to Vulcan/ICA damages)—ninety percent liability of Vulica Shipping for Port Aggregates' damages].

31. Awarding prejudgment interest is left to the court's discretion. *Zim Israel Navigation Co. v. Special Carriers, Inc.*, 800 F.2d 1392, 1395 (5th Cir.1986).

32. Absent special circumstances, prejudgment interest is awarded in admiralty cases from the time of collision or accident. *King Fisher Marine Service, Inc. v. The N/P SUNBONNET*, 724 F.2d 1181, 1187 (5th Cir. 1984); *Williamson Leasing Co. v. American Commercial Lines, Inc.*, 616 F.Supp. 1330, 1342 (E.D.La.1985). We find such special circumstances present here. Due to the complex nature of the relationship between the parties and the uncertainty as to liability, we conclude that neither party should recover prejudgment interest.

33. Each party is to bear their own costs and attorneys' fees.

34. To the extent the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.

Thus done and signed.

### JUDGMENT

IT IS ORDERED, ADJUDGED AND DECREED that defendant, PORT AGGREGATES, INC., pay unto VULICA SHIPPING CO., LTD., the sum of Six Thousand Three Hundred and forty-six dollars and seven cents ($6,346.07), together with interest from the date of judgment until payment is made.

This payment fully satisfies all claims arising out of the underlying incident. Any and all other remaining claims asserted by VULCAN/ICA DISTRIBUTION COMPANY, UNITED STATES FIRE INSURANCE COMPANY, VULICA SHIPPING CO., LTD., and/or PORT AGGREGATES, INC. against one another, are hereby DIS-

MISSED, in accordance with the opinion rendered in this case.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana on this 2nd day of August, 1994.