837 So.2d 96 (2002)
James HENNEGAN
v.
COOPER/T. SMITH STEVEDORING COMPANY, INC.
No. 2002-CA-0282.
Court of Appeal of Louisiana, Fourth Circuit.
December 30, 2002.
Writ Denied April 21, 2003.
*100 Stephen B. Murray, Stephen B. Murray, Jr., Murray Law Firm, New Orleans, LA, and Thomas M. Discon, Discon Law Firm, Mandeville, LA, for Plaintiff/Appellee.
George C. Freeman, III, Denise M. Pilie', Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.).
WILLIAM H. BYRNES III, Chief Judge.
Garlock, Inc. ("Garlock") appeals a judgment in favor of the plaintiff, Mary Hennegan, individually and on behalf of the estate of her late husband, James Michael Hennegan, in this maritime asbestos products liability tort action where the trial court found the manufacturer, Garlock, solidarily liable after a bench trial. We affirm.
From 1965 to 1968, the decedent, James Hennegan, was employed as a Jones Act seaman/deckhand aboard a fleet of derrick barges owned and operated by his employer, T. Smith & Sons (now doing business as Cooper/T. Smith Stevedoring Company, Inc.) ("Cooper/T.Smith"). Among his duties, Mr. Hennegan was responsible for the maintenance of the steam derricks aboard the barges. On February 10, 1997, James Hennegan was diagnosed with malignant mesothelioma at age 54. He died three years later in December 1999.

Procedural History
On August 5, 1997, James Hennegan filed suit in civil district court against his employer, Cooper/T. Smith, under the Jones Act and general maritime law. He claimed damages arising from mesothelioma caused by his exposure to asbestos aboard Cooper/T. Smith's derrick barges.
On December 30, 1997, Cooper/T. Smith filed a third-party demand against Amdura, Inc. ("Amdura"), successor in interest to American Hoist, manufacturer of the cranes aboard the derrick barges. On May 12, 1998, Cooper/T. Smith filed a supplemental third-party demand against various manufacturers of asbestos products allegedly aboard the derrick barges during Mr. Hennegan's employment. The defendants included Garlock, the manufacturer of gaskets and packings used at Cooper/T. Smith; Owens Corning Fiberglass ("OCF"), the manufacturer of Kaylo, an asbestos pipe cover; Owens-Illinois ("O-I"), the previous manufacturer of Kaylo; W.R. Grace & Co.Conn., as well as Eagle, Inc., and A.P. Green Industries, Inc., the manufacturer of mortar and firebricks used in the boilers on the Cooper/T. Smith vessels. Also named as a defendant was the City of New Orleans, the employer of Mr. Hennegan, who worked as a city fireman for over 20 years. Pursuant to the plaintiff's motion, Cooper/T. Smith's third-party claims were severed from the plaintiff's action against Cooper/T. Smith.
In August 1998, Mr. Hennegan settled with Cooper/T. Smith. In October 1998, Mr. Hennegan filed a supplemental petition, naming the parties alleged by Cooper/T. Smith to have furnished asbestos-containing products to Cooper/T. Smith *101 during his employment. Mr. Hennegan named as defendants Garlock, O-I, Amdura, A.P. Green, Eagle and OCF. Other defendants were dismissed without prejudice prior to trial.
Mr. Hennegan settled with Amdura. In December 1999, the plaintiff, James Hennegan, died, and his wife was substituted as party plaintiff as the administratrix of the estate. On March 31, 2000, Mrs. Hennegan filed another supplemental petition, asserting a wrongful death claim on behalf of herself and a survival action on behalf of James Hennegan's estate.
In October 2002, OCF, the manufacturer of the "Kaylo" pipe insulation used aboard the derricks, filed for bankruptcy, and all lawsuits against it were stayed. Prior to trial the plaintiff settled with A.P. Green, and the plaintiff dismissed the City of New Orleans without prejudice. The bench trial commenced on April 16, 2001 against the remaining defendants, Garlock, O-I, and Eagle. The parties agreed to dismiss Eagle without prejudice on the second day of trial. After the plaintiff rested, the trial court granted a directed verdict in favor of O-I. Garlock was the remaining defendant at the end of trial on April 20, 2001.
On July 30, 2001, the trial court rendered its judgment against Garlock, awarding $2,500,000 in general damages plus legal interest, as well as special damages in the amount of $596,769.62. The trial court found that Amdura and A.P. Green were not at fault. The trial court held that Garlock was 80 percent at fault. The trial court concluded that Cooper/T. Smith was 20 percent at fault, and reduced the award against Garlock by that amount. The trial court held that Garlock was solidarily liable for the remaining damages. Garlock's appeal followed.
On appeal, Garlock contends that the trial court erred in: (1) shifting the burden to Garlock to disprove that Garlock's products caused Mr. Hennegan's disease; (2) finding Garlock's encapsulated gaskets and packing were the substantial cause of Mr. Hennegan's mesothelioma; (3) finding Garlock's gaskets and packing were unreasonably dangerous; (4) finding Cooper/T. Smith was only 20 percent liable for Mr. Hennegan's damages; and (5) finding Garlock was liable for Mr. Hennegan's remaining damages. Further, Garlock maintained that the trial court erred in exonerating Amdura and A.P. Green from all liability.

Standard of Review
Admiralty claims may be brought in federal court pursuant to its admiralty jurisdiction or in state court under the savings to suitors clause; in either case, federal substantive maritime law applies. Antill v. Public Grain Elevator of New Orleans, Inc., 577 So.2d 1039 (La. App. 4 Cir.1991), writ denied 581 So.2d 684 (La.1991). In an admiralty case, the appellate court reviews the district court's findings of fact for clear error and considers all questions of law de novo. Randall v. Chevron U.S.A., Inc., 13 F.3d 888 (5 Cir.1994), modified on other grounds on rehearing, 22 F.3d 568 (5 Cir.1994), certiorari dismissed sub nom. Sea Savage, Inc. v. Chevron U.S.A., Inc., 512 U.S. 1265, 115 S.Ct. 5, 129 L.Ed.2d 906 (1994).
Factual findings made by the trial court in a claim under general maritime law are reviewed under a clearly erroneous standard, which is the same manifestly wrong or clearly wrong standard of review used by the Louisiana appellate courts in reviewing factual findings of lower courts. Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4 Cir.1992), writ denied 613 So.2d 996 (La.1993), certiorari denied sub nom. Brown & Root, Inc. v. Mistich, 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709. If the district court's account of the evidence *102 is plausible in light of the record viewed in its entirety, the appellate court may not reverse it even though it is convinced that if it had been sitting as the trier of fact, it would have weighed the evidence differently. Anderson v. Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987). A court sitting in admiralty apportions damages in accordance with principles of comparative negligence. Vulcan Materials Co. v. Vulica Shipping Co., Ltd., 859 F.Supp. 242 (W.D.La.1994).

Causation
In the present case, the trial court found that Garlock was strictly liable for Mr. Hennegan's illness and death. Under a strict tort products liability theory, to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. Id. Issues of negligence and causation in admiralty cases are treated as fact questions. Johnson v. Offshore Exp., Inc., 845 F.2d 1347 (5 Cir.1988), certiorari denied sub nom. Offshore Exp., Inc. v. Johnson, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). Causation is a question of fact and the trier of fact's determinations are entitled to great weight and cannot be disturbed absent manifest error. Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La.1991); Anglin v. White, 572 So.2d 779 (La.App. 4 Cir.1990). Causation may be proved by either direct or circumstantial evidence, but the evidence must be sufficient to tilt the balance from possibility to probability. Anderson v. Whittaker Corp., 894 F.2d 804, 812 (6 Cir.1990).

Substantial Factor
Garlock claims that the trial court erroneously found that one asbestos fiber can cause mesothelioma, or that exposure to one fiber was equated with substantial causation. To prove legal cause,[1] the plaintiff had to show that the defective or dangerous condition was a substantial factor in bringing about the resulting harm. Quick v. Murphy Oil Co., 93-2267 (La.App. 4 Cir. 9/20/94), 643 So.2d 1291, writ denied, 94-2583 (La.1/6/95), 648 So.2d 923. There can be more than one cause in fact, making multiple wrongdoers liable. Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). The plaintiff must show that the defendant's conduct was a "substantial factor" in bringing about the harm. Abadie v. Metropolitan Life Ins. Co., 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46. A substantial factor need not be the only causative factor; it need only increase the risk of harm. Spinks v. Chevron Oil Co., 507 F.2d 216 (5 Cir.1975); Haynes v. Calcasieu Medical Transp., Inc., 97-300, p. 6 (La.App. 3 Cir. 10/29/97), 702 So.2d 1024, 1028, writs denied 98-0355 & 0360 (La.3/27/98), 716 So.2d 888 & 889. Whether the defendant's breach of a duty was a substantial factor in *103 bringing about the plaintiff's injury is a question of fact. Id., 97-300, p. 6, 702 So.2d at 1029.

Asbestos Products
Garlock avers that Mr. Hennegan testified that he was exposed to asbestos products while doing maintenance work by pulling out tubes on boilers and working on brake lines. Pulling tubes required Mr. Hennegan to crawl into boilers. He also removed asbestos coating off the outside of boilers by hand, cutting it with a razor and pulling it off. Mr. Hennegan helped change asbestos brake linings on Cooper/T. Smith cranes. Changing the brake linings required grinding the brakes with a grinder. However, Garlock asserts that it did not manufacture any of the asbestos products to which Mr. Hennegan testified that he may have been exposed. Garlock maintains that it did not manufacture the insulation around the steam pipes, the firebricks in and around the boiler, or the brake linings on the cranes. Garlock argues that A.P. Green manufactured the insulation and firebricks, and it was undetermined who manufactured the brake linings.
Garlock claims that only some of its gaskets and packing contained asbestos, and that the Garlock products Cooper/T. Smith used contained only chrysotile asbestos, which had been medically proved not to cause mesothelioma. Garlock explains that Garlock's gaskets and packing containing asbestos were encapsulated into another polymer, causing the asbestos to be non-respirable. Garlock submits that it is "only if or when the gaskets are ground that they can release any asbestos at all; the asbestos is encapsulated in the gasket and cannot be released." Garlock asserts that it is undisputed that the only time the gaskets could have emitted any kind of asbestos was when they were being changed, and then only when the change required scraping, chiseling or power buffing.

Garlock's Expert Witness, Dr. Allen Feingold
Dr. Allen Feingold, Garlock's physician, lung expert and authority on asbestos-related diseases, testified that the release of fibers from Garlock gaskets was far below what is necessary to cause mesothelioma, and it was scientifically impossible for one fiber to cause mesothelioma. He also stated that no amount of chrysotile asbestos fibers can induce mesothelioma.
Dr. Feingold made an analogy between mesothelioma and severe sunburn. He testified that severe sunburn is also a dose-related injury. Every exposure to the sun, no matter how slight, contributes to the injury. This means that every exposure to the sun, no matter how slight, is a substantial cause of severe sunburn. However, the vast majority of exposures are medically insignificant.

Garlock's Expert Witness, Carl Mangold
Garlock's expert, an industrial hygienist, Carl Mangold, testified that exposure to asbestos emissions from gaskets used in valves were well within the range found in the ordinary environment, and were below the Occupational Safety and Health Administration ("OSHA") and Environmental Protection Agency ("EPA") standards. Mangold said he isolated the Garlock products to study them without the influence of all the other extraneous materials.
Mangold was unaware of a study by Smith and Wright in 1996 that was entitled "Chrysotile Asbestos is Main Cause of Plural Mesothelioma," published in the American Journal of Industrial Medicine. Mangold agreed that dust falling out from operations would become airborne, and that any asbestos product in the area would add to the accumulation of dust on *104 the floor. Mangold also agreed that a lack of ventilation increased the amount of asbestos respirable emissions in the boiler room.
Mangold asserted that the delay time for manifestation of mesothelioma was sometimes 30 or 40 years, and "the lower the dose the longer it seems to take before it's manifested." Mangold said, "You have to look at a person's total exposure. In this particular case it's difficult to do." Mangold testified: "I would say it would be impossible for someone to take a codal sample like that, and say ah ha, this fiber came from that product and this fiber came from that product[;] you just simply can't tell." He agreed that the Garlock asbestos gaskets and packing products were the only ones he would exclude from the plaintiff's exposure as causative of his disease.

Garlock's Expert Witness, Dr. Robert Jones
Garlock's witness, Dr. Robert Norwood Jones, was an expert in internal medicine and pulmonary disease, specifically in asbestos related diseases. He concluded that Mr. Hennegan's exposure from gaskets and packing was miniscule and made no real substantial contribution to his disease. Dr. Jones testified that Mr. Hennegan's childhood exposure to amphibole asbestos from the neighboring Johns-Manville ("JM") Marrero plant would be more contributory to his disease due to its long latency period. The JM plant waste was used to construct driveways, sidewalks and filling in the area. Mr. Hennegan lived one-half mile away as a child. The waste or scraps contained asbestos materials that deteriorated over time, turned into powder, and allowed asbestos fibers to become airborne. They were inhaled by the residents living in the area.
Dr. Jones opined that levels of asbestos fibers released from gaskets in the derrick barge boiler rooms were miniscule compared to other workplace exposures. He stated that there is no way to prove or disprove that one fiber can cause the harm.
Garlock maintains that the plaintiff's expert, an animal cell biologist, Dr. Arnold Brody, agreed that even an individual with as much as 1,800,000,000 asbestos fibers in the lung has no increased risk of contracting mesothelioma, as that amount falls with the environmental range of ambient asbestos fibers in urban areas. Dr. Brody agreed that some asbestos exposures are insignificant. Garlock argues that mesothelioma is a dose-related disease and that, the greater the dosage, the greater the risk. Garlock notes that the plaintiff's expert witness, Dr. John Dement, testified that all exposure, regardless of the amount, contributed to the risk. Garlock asserts that cumulative exposure increases the risk.
Garlock asserts that Mr. Hennegan did not know whether the gaskets he saw were Garlock gaskets, or whether the gaskets contained asbestos. Mr. Hennegan testified that he may have been present when the gaskets were changed once or twice. Garlock contends that Mr. Hennegan's possible exposure, on one or two occasions, to encapsulated asbestos fibers contained in Garlock products, did not and could not have caused his mesothelioma.

Plaintiff's Expert Witness, Dr. John Dement
Plaintiff's expert, industrial hygienist John M. Dement, Ph.D., testified that it was impossible to rule out any of the exposures as causative of Mr. Hennegan's disease although other exposures could also have caused the disease. Dr. Dement opined that the installation and removal of the asbestos gaskets and packings results *105 in the release of significant amounts of respirable asbestos fibers. Dr. Dement asserted that the activities of removing gaskets and packings in a confined space increased the risk of exposure to the asbestos fibers. Dr. Dement referred to studies that showed exposures well below the established OSHA exposure guideline limits can cause mesothelioma. Very low doses of asbestos have been shown to cause mesothelioma. Dr. Dement noted that: "With asbestos, and some other materials as well, we do know that exposure is even to household members, based on [workers] taking contaminated clothing home, as a cause of mesothelioma."
When asked about asbestos fibers encapsulated in the gaskets, Dr. Dement opined that:
But there are some studies that if you actually look on the surface of these gaskets, it's true that the fibers are embedded in the matrix, but there's also free ends of fibers that are actually on the surface. So they are capable of being removed when just typically handled.
Dr. Dement noted that in gaskets and particularly in packing, the matrix material tended to actually lose some of the binding material as they age. Mr. Hennegan was present when the gaskets and packings that had deteriorated in the boiler rooms were repaired and replaced or afterwards when the fibers were in the dust in the confined area. Dr. Dement agreed that data supports the conclusion that the removal of packing materials can result in the emission of respirable asbestos fibers. He agreed that published literature supports the finding that the packings become brittle and resulted in the emission of respirable asbestos fibers. Dr. Dement asserted that it would be more likely that the bystander would actually experience exposure in the confined space of the boiler rooms with little ventilation. The confined space contributed to the risk.
Dr. Dement concluded that Mr. Hennegan's exposure to Garlock asbestos gaskets and packing alone could have caused Mr. Hennegan's mesothelioma. The exposure substantially contributed to causing Mr. Hennegan's mesothelioma.

Plaintiff's Expert Witness, Dr. Arnold Brody
Plaintiff's witness, Dr. Arnold R. Brody, was an expert in the field of cell biology and pathology as it relates to the development of asbestos. He stated that mesothelioma is a disease that begins with a single fiber acting on a single cell, and it is impossible to state which of the individual's multiple exposures was causative of mesothelioma. Dr. Brody explained that the pleura is a very thin membrane that makes an airtight sack out of the lungs that can expand with elastic connective tissue so the lungs remain flexible. However, mesothelioma causes a dramatically thickened pleura membrane around the lung.[2] Asbestos fibers get into the lung *106 cells and cause cancer, which is the result of mutations in genes that control cell growth. Over the years, there is a build-up of mutations where the cell finally escapes the body's defense mechanisms and develops into cancer.
Dr. Brody testified that: "Everytime a person's exposed, they're adding individual fibers to the system and any one of those fibers can get to the target site and participate in the disease." Dr. Brody stated that: "if a product releases asbestos, those fibers will participate in the process." Dr. Brody explained that: "A single error caused by an original fiber is enough to initiate the process." He stated: "So, any fiber that gets into the system can initiate a process that can lead to cancer." He opined that a very low exposure can trigger mesothelioma in some people over time. Dr. Brody could not say which fiber or fibers started the disease mesothelioma. He agreed that any given exposure cannot be segregated to determine which exposure caused mesothelioma.
Dr. Brody agreed that it takes more exposure to chrysotile asbestos to cause mesothelioma than exposure to the amphiboles, crocidolite and amosite. Dr. Brody stated: "I don't know why getting them there in bursts or peak periods over years versus low exposures over time, it just wouldn't occur to me that that should control whether or not someone gets mesothelioma." He opined that chrysotile causes mesothelioma.

Chrysotile Asbestos
The record shows that Mr. Hennegan was exposed to asbestos fibers emitted from asbestos products made by Garlock as well as other manufacturers aboard the Cooper/T. Smith derrick barges he worked as a deckhand. Garlock's expert pulmonologist, Dr. Feingold, stated that mesothelioma is not caused by chrysotile asbestos but is caused by crocidolite asbestos and other amphiboles. Garlock maintains that its products only contained chrysotile asbestos. However, the plaintiff's experts, Dr. Dement and Dr. Brody, found that chrysotile asbestos is capable of causing mesothelioma, and has no minimum threshold dose.

Plaintiff's Witness, Victor Schmidt
Victor Schmidt,[3] the maintenance supervisor during Mr. Hennegan's employment, testified that Garlock's gaskets and packings were the kind most frequently used at Cooper/T. Smith. Schmidt looked at the pictures in documents attached to his affidavit, Plaintiff's Exhibit 3. He identified the logo, a ruler and caliper (the Garlock symbol), throughout the sheet packing. Schmidt remembered it because "we used it more than all the other ones. I mean, it was all over the sheets. This little symbol right here."
Schmidt stated that there were "shelves of the stuff" (asbestos products) on the steam cranes where Mr. Hennegan worked. Schmidt related that he was quite certain that on the derricks, the Garlock gaskets and packing contained asbestos. He said that it was necessary for workers to take a break during the removal of Garlock gaskets because a grinder produced so much dust. At trial Schmidt stated: "Everybody did everything together. Nobody just had one job and that was all."
*107 Garlock's expert, Carl Mangold, agreed that the use of grinders to remove Garlock gaskets, would result in the emission of respirable asbestos fibers. However, he declared that the use of a grinder was an abuse of the product. He agreed that Garlock provided no warning against the use of a grinder to remove the gaskets. Schmidt stated that a grinder was the method used on gaskets and packing at Cooper/T. Smith.

Plaintiff's Witness, Joseph Dugas
Joseph Baptist Dugas was a co-employee/deckhand who worked with Mr. Hennegan. Dugas testified that Dugas frequently changed out gaskets and packings with Mr. Hennegan present. He saw Mr. Hennegan perform these tasks. Dugas could not remember the brand names on the packings and gaskets; however, considering that Schmidt testified that Garlock supplied the gaskets and packings most frequently used, the trial court reasonably concluded that the workers changed various asbestos gaskets and packings that were produced by Garlock. Mr. Hennegan worked with other employees who changed Garlock products with asbestos in significant amounts.
Dugas and Schmidt testified that the handling of gaskets and packings resulted in lifting visible airborne fibers. Schmidt stated that to remove the gaskets, workers, including deckhands, sometimes used grinders. The trial court reasonably could infer that use of a power grinder by the workers resulted in the production of respirable asbestos fibers. The use of a grinder to remove the gasket and packing materials was a reasonably foreseeable use of the products. Whether or not Mr. Hennegan used a grinder himself, he would have been exposed to fibers as a bystander during the grinding procedure, and/or afterward, when the asbestos fibers landed on the floor, the dust was swept and the fibers became airborne again in the confined area with little ventilation.
The record contains evidence upon which the trial court reasonably could find as a matter of fact that Mr. Hennegan was exposed to friable respirable asbestos fibers in Garlock products while he was working as a Cooper/T. Smith deckhand in the poorly ventilated boiler rooms on the derrick barges. There is no minimum established dose threshold for exposure to asbestos in causing mesothelioma.

Unreasonably Dangerous Per Se
Garlock avers that the presence of asbestos in a product does not render the product per se defective or unreasonably dangerous. Garlock referred to asbestosis cases: Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129 (5 Cir.1985); and Hardy v. Johns-Manville Sales Corp., 681 F.2d 334 (5 Cir.1982). The record in the present case contains evidence that the disease mesothelioma can be caused by minimum exposure to friable asbestos fibers emitted when the Garlock asbestos products were removed with the use of a grinder.
In Asbestos v. Bordelon, Inc., 96-0525, pp. 15-16 (La.App. 4 Cir. 10/21/98), 726 So.2d 926, 942, this Court stated:
"Unreasonably dangerous per se" denotes a product that is defective due to the fact that the risk imposed on the user outweighs the social utility of the product. In other words, the product's benefit to society is overshadowed by its potential for causing harm to the average consumer. However, evidence concerning the manufacturer's conduct, knowledge or technology is irrelevant in this equation. [Citations omitted.]
The risk-utility test employed by the trier of fact is dependent upon whether the injury sustained by the plaintiff is attributed to the "normal use" of the *108 product. Normal use is a matter of foreseeable use and may include something broader than operation exactly in accordance with the manufacturers instructions. Bloxom, 494 So.2d at 1304.[I]t is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product. Page v. Gilbert, 598 So.2d 1110, 1116 (La.App. 4 Cir.1992), writ denied, 605 So.2d 1146 (La.1992); citing Rey v. Cuccia, 298 So.2d 840 (La.1974); and Branch v. Chevron International Oil Co., Inc., 681 F.2d 426 (5th Cir.1982). When the victim or a third party engages in conduct that ignores or disregards an obvious or well-known danger, this conduct is not normal use. Whitacre v. Halo Optical Products, Inc., 501 So.2d 994, 999 (La. App. 2nd Cir.1987); Savoie v. Deere & Co., 528 So.2d 724, 733 (La.App. 1st Cir.1988), writ denied, 532 So.2d 177 (La.1988), (Emphasis theirs). While the manufacturer must provide a reasonably safe product, he does not insure against conduct not in normal use. Clark v. Jesuit High School of New Orleans, 96-1307 (La.App. 4 Cir. 12/27/96), 686 So.2d 998, 1002. Hence, the injury resulting from normal or intended use of the product is just as essential in a products liability claim as the danger-in-fact of the product.
In an asbestosis case, Halphen v. Johns-Manville Sales Corp., supra, the Louisiana Supreme Court found that an asbestos product was unreasonably dangerous per se in referring to maritime strict products liability when the gravity of the harm outweighed the potential utility of the product.
In the present case, in its Reasons for Judgment, the trial court stated that maritime law recognizes strict products liability for unreasonably dangerous products. A product may be unreasonably dangerous if the risks associated with its use outweigh its utility, or, even if the utility outweighs the risk, the manufacturer fails to provide adequate warning of the risks. The trial court concluded that Garlock was strictly liable because the utility of the asbestos products is vastly outweighed by the risk of death associated with their use, and Garlock did not provide warnings of the risks.
Garlock's expert, Carl Mangold, stated that the use of a grinder to dislodge the old gaskets when repairing or replacing them, was a misuse. However, the use of a grinder in this matter was reasonably foreseeable. Considering that there was testimony that a small exposure to asbestos emitted fibers could cause mesothelioma over time, the trial court did not err in finding that Mr. Hennegan's exposure to the emission of friable asbestos in Garlock's products, was a substantial contributing cause of the plaintiff's mesothelioma. The trial court properly concluded that the Garlock products emitted respirable asbestos fibers when removed with a grinder. The fibers continually became airborne when the workers walked or swept in the boiler rooms without proper ventilation. The risk of harm outweighed the asbestos product's utility, and the manufacturer provided no warnings of the risks. The trial court properly found that the Garlock asbestos products were unreasonably dangerous per se.

Failure to Warn
Garlock contends that the trial court erred in finding that it had a duty to warn because it was the employer Cooper/T. Smith's duty to protect its employees from exposure to asbestos fibers. Garlock asserts that the duty to warn is passed entirely to the sophisticated knowledgeable purchaser, absolving the manufacturer of the duty to warn. Todd Shipyards Corp. v. Hercules, Inc., 859 F.2d *109 1224, 1225 (5 Cir.1988). The manufacturer's duty to warn is discharged when the purchaser/user knew or should have known of any dangers associated with the product. Morgan v. Gaylord Container Corp., 1993 WL 205052 (E.D.La.1993).
In Pavlides v. Galveston Yacht Basin, Inc., 727 F.2d 330, 338 (5 Cir.1984), the Fifth Circuit stated:
It is a fundamental principle of the law of product liability in this Circuit that a manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold. Borel [v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5 Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974),] at 1088-90; see Restatement (Second) of Torts, Section 402 A. comment j. In assessing what hazards are foreseeable, a manufacturer is held to the status of an expert. Borel, 493 F.2d at 1089. The lack of adequate warnings renders a product defective and unreasonably dangerous even if there is no manufacturing or design defect in the product. Martinez v. Dixie Carriers, Inc., 529 F.2d 457, 465-66 (5th Cir.1976); Reyes, 498 F.2d at 1272-73. [FN13 omitted]
In Asbestos v. Bordelon, Inc., supra, 96-0525, at p. 43-44, 726 So.2d at 955, this Court stated:
It is only when those hazards are obvious and expected, or when the consumer is distinctly aware of those hazards (sophisticated user) that a warning is not required. See Mozeke v. International Paper Co., 933 F.2d 1293, 1297 (5th Cir.1991). [T]here is no duty to warn sophisticated users of the dangers, which they may be presumed to know about because of their familiarity with the product.
This Court noted:. "... a sophisticated user possesses more than a general knowledge of the product and how it is used." Id. at p. 44, 726 So.2d at 955. In Bordelon, this Court found that the shipyard, Avondale, was not a sophisticated user, and the manufacturer of the insulation material could not eliminate its duty to warn the plaintiffs. Id. at p. 45, 726 So.2d at 955.
In the present case, Garlock's expert witness, Carl Mangold, agreed that awareness of the hazards of asbestos exposures during the time of Mr. Hennegan's employment was less in the stevedoring industry than in shipyards. The trial court properly found that Cooper/T. Smith was not a sophisticated user of the product. The manufacturer, Garlock, had the duty to warn the buyer/employer and its employees of the hazards of asbestos exposures.
The trial court did not err in finding that Garlock had a duty to warn of the danger of using a grinder but also that Garlock had a duty to warn of the need to implement industrial hygiene procedures while working with Garlock gaskets and packing. The trial court found that the use of a grinder to remove gaskets was a foreseeable use of the product. The foreseeable use of a product is a question of fact that will not be disturbed on appeal absent clear error. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).
Considering the conflicting evidence, the fact finder's choice between them is not manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989). The trier of fact is vested with assessing the witnesses' credibility. In its reasons for judgment, the trial court stated that: "The Garlock packings and gaskets ... to which Mr. Hennegan was exposed were both unreasonably *110 dangerous per se and unreasonably dangerous by virtue of Garlock's failure to provide warnings of the hazards associated with their use and the need to provide respiratory protection." The trial court was not clearly wrong in finding that Garlock is strictly liable for substantially contributing to Mr. Hennegan's mesothelioma, which was caused by exposure to asbestos from Garlock products.

Burden of Proof
Garlock argues that the plaintiff had the burden to prove that Garlock's products substantially caused Mr. Hennegan's disease. Instead, Garlock avers that the trial court shifted the burden to Garlock to prove that none of its fibers substantially caused his disease. Garlock submits that Mr. Hennegan's exposure to gaskets and packing occurred in the boiler rooms on the derrick barges where he worked.
The plaintiff refers to Moak v. Link-Belt Co., 229 So.2d 395 (La.App. 4 Cir. 1969), affirmed in pertinent part, reversed in part, 257 La. 281, 242 So.2d 515 (1970), in which, under a negligence tort theory, where two tortfeasors acted in such a manner that the conduct of either could have caused the plaintiff's injury, and it cannot be determined which defendant's conduct was the actual cause of the injury, the burden shifted to the defendants to exonerate themselves. This Court stated:
In Meyer v. St. Paul-Mercury Indem. Co., 61 So.2d 901 (La.App.1952), a patient injured during an operation sued the oral surgeon and the anesthesiologist, and in fact the case proceeded on a res ipsa basis, with both defendants exculpating themselves.
In Arrington v. Hearin Tank Lines, 80 So.2d 167 (La.App.1955), plaintiff was damaged by fire resulting from the ignition of crude oil which had leaked from a storage tank owned by one defendant but being emptied into tank trucks owned by another defendant. Plaintiff's petition merely alleged control and supervision in both defendants, relying on res ipsa. The court held the petition stated a cause of action, and again, the case in fact proceeded on the theory that each defendant had to exculpate itself.
* * *
We conclude the rule of res ipsa loquitur warrants the inference that both American and Link-Belt were guilty of negligence causing the explosion, and that the inference is valid against each.

Id., 229 So.2d at 409-410.
In the present case, the trial court did not shift the burden of proof to the defendant Garlock. The plaintiff had the burden to prove that Mr. Hennegan was exposed to asbestos fibers from Garlock's products, and that the defect in the Garlock products, the emission of friable asbestos, was a substantial contributing cause of the Mr. Hennegan's mesothelioma. The plaintiff showed that a small exposure to friable asbestos fibers from Garlock products substantially caused Mr. Hennegan's mesothelioma over time, that Garlock did not provide warnings of the hazards of the use of its products, and that the Garlock asbestos products were unreasonably dangerous per se.

Solidary Liability
Garlock argues that the trial court erred in finding Garlock liable for all of Mr. Hennegan's damages and by failing to apportion an appropriate share to the remaining defendants. Garlock maintains that under maritime law, damages are apportioned on the basis of proportionate fault. McDermott, Inc. v. AmClyde, 511 U.S. 202, 114 S.Ct. 1461, 1465, 128 L.Ed.2d 148 (1994). Damages are apportioned among all the defendants held liable regardless of whether they settled before *111 trial. Id.; U.S. v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); Coats v. Penrod Drilling Corp., 61 F.3d 1113 (5 Cir.1995). Under the maritime rule of solidary liability, a tortfeasor may be held liable for more than its degree of fault. Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 108, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974).
In the present case, the trial court held Garlock liable for all of the plaintiff's damages, but reduced the plaintiff's recovery by the 20 percentage of fault attributable to the settling defendant, Cooper/T. Smith. In its Reasons for Judgment, the trial court held:
Under maritime joint and several liability, if a defendant is found to have contributed at all to plaintiff's injury, even if that defendant's fault contributed less than one percent to the injury, that defendant is liable unto plaintiff for the whole of plaintiff's injuries. Since this Court has found that Garlock's liability contributed to plaintiff's mesothelioma, Garlock is solidarily liable for the whole of plaintiff's injury even though other entities may have contributed more to plaintiff's mesothelioma than did Garlock....
The plaintiff asserts that in McDermott v. AmClyde, supra, the United States Supreme Court noted that under the principles of joint and several liability, the solidary obligation would require the non-settling defendant to bear the proportion of fault attributable to an absent tortfeasor.
In Mayo v. Nissan Motor Corp., 93-852 (La.App. 3 Cir. 6/22/94), 639 So.2d 773, writs denied 95-0147, 0148 & 0160 (La.3/17/95), 651 So.2d 280 & 281, the Third Circuit held that limiting the plaintiffs' recovery to percentages of fault attributable to the named defendants was inconsistent with maritime solidary liability. The Third Circuit held the two non-settling defendants liable for the fault attributed to the unnamed defendant, giving a credit only for the 11 percent fault actually attributed to the settling defendant. The non-settling named defendants were held solidarily liable for the whole of the plaintiffs' damages, and received a credit for the percentage of fault attributed to the settling defendant. Under a claim of solidary liability, the risk of non-collectability of the judgment against the party not named by the plaintiff rests with the solidary obligors. A solidary obligation provides that the risk of the inability to collect from joint tortfeasors rests with the defendant. Coats, supra.
The plaintiff points out that Garlock's assertion that the percentage of fault should be proportioned with the missing tortfeasors would discourage settlements in cases of solidary liability if a settlement would result in his inability to collect the whole of his judgment (less the percentage attributable to the settling defendant) from the remaining tortfeasors. In McDermott, supra, 114 S.Ct. at 1466, n. 10, the United States Supreme Court noted that under the principles of joint and several (solidary) liability, the non-settling defendant's share of the judgment includes any fault attributable to immune or absent parties. We agree with the trial court's determination in the present case that: "Garlock is solidarily liable for the whole of plaintiff's injury even though other entities may have contributed more to plaintiff's mesothelioma than did Garlock."

Liability of Cooper/T. Smith
Garlock avers that the trial court erred in allocating only 20 percent of fault to Cooper/T. Smith. The factfinder's *112 allocation of fault is subject to the manifest error standard of review. Clark v. Burchard, 2000-2750 (La.App. 4 Cir. 11/14/01), 802 So.2d 824. At the time that Mr. Hennegan worked as a deckhand for Cooper/T. Smith, the awareness of the need for protection for workers handling asbestos had not extended to the purchaser, Cooper/T. Smith, and the manufacturer had not provided warnings to Cooper/T. Smith. Where the manufacturers had not warned Cooper/T. Smith of the hazards of the use of their products, the trial court's finding that Cooper/T. Smith was 20 percent at fault is reasonable.

Liability of A.P. Green
Garlock maintains that the trial court erred in finding that the settling defendant, A.P. Green, did not share any fault in causing Mr. Hennegan's mesothelioma. At trial the A.P. Green products identified were A.P. Green firebricks and a product known as "Super Hy-Bond." The plaintiff introduced the deposition of Ellis Smith, a former A.P. Green employee/research engineer, who testified that A.P. Green firebricks did not contain asbestos. Mr. Smith testified that only a very small percentage of the cements manufactured by A.P. Green contained asbestos, and he did not identify Super Hy-Bond as one of A.P. Green asbestos products. The plaintiff notes that Garlock referred to the depositions of Victor Schmidt and Joseph Wolf, who identified A.P. Green products as containing asbestos; however, these depositions were not introduced into evidence. Garlock did not show that A.P. Green was at fault for exposure to A.P. Green's asbestos products. The trial court did not err in not allocating a percentage of fault to the settling defendant, A.P. Green.

Liability of Amdura
Garlock claims that the trial court erred in finding that the settling defendant Amdura did not share any fault in causing Mr. Hennegan's mesothelioma. Under maritime law, the burden of showing fault on the part of the settling defendants rests with the non-settling defendants. Bordelon, supra.
Garlock did not introduce evidence that A.P. Green or Amdura were at fault. The plaintiff introduced into evidence the deposition of Carl William Ireland, a former employee of American Hoist, which was Amdura's predecessor in interest. Mr. Ireland testified that American Hoist constructed the Cooper/T. Smith cranes from the 1930's to the 1950's. The only asbestos components were asbestos brake pads that were manufactured by other entities and not American Hoist. Mr. Ireland testified that the asbestos brake pads met the industrial standard at the time, and American Hoist was unaware of any hazards with the use of the brake pads. Considering that there was no evidence that: (1) the manufacturers of the brake pads provided warnings of the hazards of their products, or (2) American Hoist was a sophisticated user of asbestos who should have known that the asbestos brake pads were hazardous, the trial court properly concluded that American Hoist acted as a reasonably prudent manufacturer of cranes in using the asbestos brake pads under industrial standards at the time. The trial court did not err in not allocating a percentage of fault to the settling defendant, Amdura.
Garlock raised the issue of the allocation of fault, but did not raise any other issues with respect to quantum. The amount of damages awarded is within the discretion of the trier of fact.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
TOBIAS, J., concurs with reasons.
*113 TOBIAS, J., concurs.
I respectfully concur. Based upon the assignments of error by the appellant, I find the trial court's judgment and reasons therefor neither manifestly erroneous nor clearly wrong.
NOTES
[1] The term "legal cause" is preferred to "proximate cause" in maritime tort law. Spinks v. Chevron Oil Co., 507 F.2d 216 (5 Cir.1975).
[2] In Asbestos v. Bordelon, Inc., 96-0525 (La. App. 4 Cir. 10/21/98), 726 So.2d 926, 938, this Court noted:

A person with pleural plaques or pleural thickening is also under an increased risk of contracting mesothelioma which is a cancer of the pleura. This cancer is untreatable and causes intractable pain because the tumor encases the lung and causes the person to die due to suffocation.
In Austin v. Abney Mills, Inc., XXXX-XXXX, p. 5 (La.9/4/02), 824 So.2d 1137, 1141-1142, the Louisiana Supreme Court noted:
Dr. Roggli concluded that Mr. Hogue [plaintiff] suffers from malignant pleural mesothelioma, well-differentiated papillary epithelial variant, caused by exposure to asbestos. He stated that mesothelioma caused by occupational asbestos exposure is a disease that typically requires twenty years between the first exposure and its appearance upon diagnosis, that each exposure is cumulative in its effect, and that there is no known safe level of exposure to asbestos with respect to the development of mesothelioma.
[3] His last name is spelled "Schmet" in the trial transcript.